936 So.2d 1111 (2006)
STATE of Florida, Appellant/Cross-Appellee,
v.
Samuel PITTS, Appellee/Cross-Appellant.
No. 2D04-1202.
District Court of Appeal of Florida, Second District.
August 4, 2006.
*1116 Charles J. Crist, Jr., Attorney General, Tallahassee, and Helene S. Parnes, Assistant Attorney General, Tampa, for Appellant/Cross-Appellee.
Robert A. Norgard, Bartow, for Appellee/Cross-Appellant.
CANADY, Judge.
This interlocutory appeal arising from the prosecution of Samuel Pitts on double murder charges concerns the trial court's ruling on a motion to suppress statements made by Pitts to the police. The State appeals the trial court's ruling suppressing certain statements made by Pitts, and Pitts cross-appeals the trial court's ruling denying suppression of certain other statements. For the reasons explained below, we conclude that none of the statements at issue in the appeal and the cross-appeal should be suppressed. We therefore reverse *1117 on the issue raised by the State and affirm on the issue raised by Pitts.

I. Standard of Review

We begin with an acknowledgement of the applicable standard of review. "Appellate courts should accord a presumption of correctness to the trial court's rulings on motions to suppress with regard to the trial court's determination of historical facts, but appellate courts must independently review mixed questions of law and fact that ultimately determine constitutional issues." Schoenwetter v. State, 931 So.2d 857 (Fla.2006). A "trial court's determinations of historical fact" will be reversed "only if not supported by competent substantial evidence in the record." Connor v. State, 803 So.2d 598, 608 (Fla. 2001). But the trial court's "application of law to those facts" is subject to de novo review. Id.

II. Background

A. The Interview with Pitts[1]
The motion to suppress addressed statements made by Pitts during the course of an extended interviewor series of interviewsconducted by officers of the Polk County Sheriff's Department. Pitts, who has an IQ of 82, was 20 years old at the time of the interview. The police sought to interview Pitts after they received information linking him to a missing-persons case involving David Lee Green and James Felker, who had disappeared on April 21, 2000. The information available to the police indicated that Pitts may have been involved in pawning property owned by one of the missing young men and that Pitts might have knowledge concerning the abduction and murder of the missing men.
Based on this information, in the early morningbetween 4:00 and 4:20 a.m.of April 26, 2000, four officers went to Pitts' apartment to seek an interview. The officers' knock on the door of the apartment was answered by Pitts' sister. An officer explained to her that they were law enforcement officers and that they "need[ed] to speak with Sammy." Pitts, who had apparently been roused from his sleep by his sister, came to the door not fully dressed and looking as though he had just been awakened.
When Pitts was informed that the officers needed to speak with him and asked if he would "mind coming on down to the substation," he told the officers that he needed to get some additional clothing. Pitts went back into the apartment out of the sight of the officers who remained at the door. The officers never entered the apartment. After a "couple of minutes," Pitts returned to the door, walked out to the officers, and then walked to a sheriff's department vehicle. Pitts no longer appeared groggy; he seemed to be fully aware of what was taking place. The officers told Pitts that he could ride with them. Pitts took a seat in the front seat of the vehicle.
Pitts never expressed any reluctance to going with the officers. The officers used no threats or coercion to force Pitts to accompany them. Although the officers were wearing sidearms, they did not draw their weapons. Pitts was not handcuffed by the officers. As Pitts walked out of his apartment, one of the officers noticed that "he was shaking quite a bit." When the officer asked him "what's wrong," Pitts responded that he was "just cold."
The officers drove with Pitts to the sheriff's northwest substation, which was two *1118 or three miles from Pitts' apartment. At the substation, although Pitts was not left alone and would not have been free to wander around the substation alone, he was never put in a holding cell or a locked room. He remained without handcuffs. The interview at the substation was relatively brieflasting from thirty minutes to an hour.
During the interview, Pitts was confronted with the fact that the officers knew he had pawned property that was owned by one of the missing young men. The officers also told Pitts that they believed that he knew the whereabouts of the missing young men and that he needed to tell the officers where the young men were. The officers were focused on the need to find the missing men. The officers did not raise their voices to Pitts, and the tone of the conversation was monotone. During this interview session, Pitts was slow to answer some questions, but he never said that he wanted to leave or that he did not want to talk to the officers. Pitts admitted to the officers that he had been a passenger in a car that was pursued unsuccessfully by the policea car believed by the police to be the vehicle being used by the missing men when they disappeared.
Toward the end of this interview, when Pitts was told that the officers believed he had pawned property belonging to one of the missing men, Pitts admitted that he pawned items given to him by Tavares Wright, who is called T.J. Near the end of the interview, Pitts "began to become upset." Pitts did not sob uncontrollably but "just put his head down and began to cry. . . . [H]e just sat there and cried a little while." Although "not weeping," Pitts "had tears in his eyes and was upset." One of the interrogating officers then said to Pitts, "Sammy, when you stand up, I know you're going to take us to those kids, I know that's when you're going to take us to them." Subsequently, Pitts "stood up and said we need to go to I-4 and 33."
The officers then drovewith Pitts again sitting unhandcuffed in the front seatto Highway 33 and "started heading north." As the officers and Pitts traveled along Highway 33, Pitts stated that T.J. had told Pitts that T.J. would bring the missing men "up here" but that Pitts "didn't know exactly where they were." Pitts "just believed that TJ would bring them up here." When the officers drove past Polk City, Pitts said, "this would be too far." As the officers then proceeded back past Polk City, Pitts said, "I don't know where they are."
After stopping at a sheriffs' department facility in Polk City, where Pitts used the restroom, the officers drove with Pitts to the Central District Substation at the Bartow Air Base to obtain a taped statement from Pitts. The officers arrived at the Central District Substation with Pitts at about 7:00 a.m. Pitts and the officers went to an interview room in the substation, and Pitts agreed to give a sworn taped statement. The officers used the same tone of voice that they used during the first interview.
In the taped interview, Pitts admitted that he had been with T.J. in the car that was chased by the police on the day the young men disappeared. He further admitted that T.J. had given him "a black bag with some tools," which Pitts had then pawned. But Pitts denied any involvement in the disappearance of the missing young men. Pitts stated that T.J. had earlier said he was "thinking about doing something illegal." According to Pitts, T.J. had said "he might get a car" and had made a reference to "leaving no witnesses." In response, Pitts had asked T.J. "where would you take them," and T.J. had replied that he would "probably hide *1119 the car somewhere in Polk City." Pitts further stated, however, that T.J. had said that he in fact took the "people who were in the car" to Polk City to a road off to the side. Pitts stated that T.J. had not mentioned that he had shot the people who had been in the car. Pitts claimed that he had only been in the car with T.J. for "about 10 or 20 minutes" and that he "never left Lakeland." Pitts also asserted that he did not think the black bag of tools was stolen.
At the conclusion of this taped interview, Pitts stated that he had not been promised anything to make his statement, that he was present of his own free will, and that the statement had been made voluntarily. The taped statement ended at 7:29 a.m.
After Pitts had given the taped statement, the interrogating officers left the interview room. Captain W.J. Martin, the supervising officer, then conducted a further interview, which was not taped. Martin testified that he decided he "would go in and sit down and talk to him and see what I thought about what he had to say." Martin observed that Pitts "was fairly well alert" and "attentive" to what Martin said. Martin said that he did not raise his voice to Pitts and that he used a "normal tone of voice." Martin told Pitts that the objective of the police "was to try to find these boys, that they had been missing for some time now." Pitts responded that "all he knew was they were in a grove somewhere in Polk City off to the right," as he had been told by T.J. Pitts added that he did not "know much about the area," that "TJ did," and that "it was dark." Martin's suspicions being further aroused by this comment, he then said to Pitts, "Sammy, I have been doing this a long time now, I think you know more than what you're telling us. I actually believe that you were there."
Pitts maintained his story that all he knew was what he had been told by T.J. Martin then wrote down on a pad he was using the statement that "TJ says Sammy killed these guys." In fact, T.J. had not made such an accusation against Pitts. After telling Pitts that he wanted to give Pitts some time to think about their discussion, Martin stepped out of the interview room, leaving "the notepad there intentionally for him to see it." When Martin returned to the interview room five minutes later, Pitts pointed at the pad, made reference to the statement on the pad that "TJ said I killed them," and said, "[M]an, that ain't right, I wasn't even there." Martin then said to Pitts that "you and I both know that ain't true, you were there, and you know where these guys' bodies are, don't you." In response to that comment by Martin, Pittswith his head hanging down"almost immediately began to tear up and cry." Although crying, with tears welling up in his eyes, Pitts did not become "uncontrollable" or "hysterical." Pitts "once again denie[d] having been there."
After that denial, Martin said, "Sammy, you know this thing is eating you up inside, and you probably see those boys laying there every time you close your eyes and you know you want to talk about it . . . . [T]he truth will set you free . . . don't bottle this thing up inside of you." Martin also said that the missing young men "deserved a proper burial" and that their families "deserve[d] to know what had happened." With tears welling up in his eyes, Pitts said, "I got a kid, can I go home if I tell you what happened or will I go to jail[?]" Martin responded that he could not tell him "one way or the other" because he did not know what Pitts would tell him. According to Martin, "I was telling him I'm not going to make a deal *1120 with him."[2]
Pitts expressed no desire to stop talking with Martin. Pitts went on to assert again that he had not killed the missing men but now admitted that "he was there." Pitts recounted that T.J. had come by Pitts' apartment. T.J. "had already jacked these guys and had them in the back seat." Pitts got in the car. At the request of T.J., Pitts held a gun on the men who were seated in the back seat. According to Pitts, T.J. then drove the car to the Polk City area, where he stopped the car, took the gun from Pitts, told the young men to get out of the car, and then "emptied the gun on them."
Pitts again agreed that he would try to take the officers to the bodies; so beginning at around 8:30 a.m., he was driven back to the Polk City area. Once again, Pitts rode in the front passenger's seat; he remained unhandcuffed. After the thirty-to thirty-five-minute drive to that area, the officer driving the vehicle followed Pitts' directions as they searched for the location of the bodies. Before Pitts was able to find the spot for which he was looking, the officer driving the vehicle received a communication"probably by the Nextel phone" but perhaps by radiothat the bodies had been found. The trial court found that Pitts was then aware of the information concerning the discovery of the bodies. Without going to the site of the bodies, the officers then returned to the Central District Substation with Pitts, stopping along the way at a McDonald's drive-in for some food for Pitts.
When Pitts and the officers returned to the substation, they went to an interview room, where an officer read Pitts his Miranda[3] rights and Pitts agreed that he would give a taped statement. One of the officers present testified specifically that after the Miranda rights were read to Pitts, he "said that he understood, agreed to talk to us, and we did a taped statement with him." Pitts signed a form labeled "Miranda Waiver" in which he acknowledged his understanding of his Miranda rights.[4]
After Pitts signed the "Miranda Waiver" form, the officers proceeded to conduct a taped interview, in which Pitts was placed under oath. At the outset of the taped interviewwhich began at 1:05 p.m.Pitts stated that he had signed a waiver form indicating that the officer had read his Miranda rights. Officer Malcolm Kneale read the Miranda rights and then asked Pitts if he understood each of the rights that had been explained to him. Pitts answered, "Yes sir." The following exchange then took place:
KNEALE: Okay, and having these rights in mind, do you wish to talk to me now?

*1121 PITTS: No sir.
KNEALE: You don't wish to talk to me?
PITTS: Mmm.
KNEALE: I'm sorry, do you wish to talk to me now? And tell your side of the story?
PITTS: Yes sir.
KNEALE: Okay, so, did, you're agreeing to talk to me, is that correct?
PITTS: Yes sir.
One of the officers present during this interview testified at the suppression hearing that he did not remember Pitts' declining to talk. The officer stated, "I think there was a misunderstanding in what was being read or what was being read and what was being asked. And that's why it was cleared up and we continued with the interview."
Pitts proceeded to provide an account of his ride to the Polk City area with T.J. and the two young men in which Pitts denied ever holding the gun on the two young men. In this account, Pitts also stated that after T.J. had shot the young men with a handgun, T.J. also shot themor attempted to do sowith a shotgun. Pitts admitted that he had touched the handgun when T.J. had showed it to him on the Monday preceding the Friday on which the murders occurred, but Pitts denied that he had ever touched the shotgun. The interview concluded at 1:42 p.m. Shortly thereafter, Pitts was arrested.

B. The Motion to Suppress

Counsel for Pitts moved to suppress all the statements made by Pitts to the police prior to his arrest. In the motion, counsel asserted: "Lies, tricks and emotional ploys were continually used until [Pitts] `cracked.' The taint of these methods was never dissipated and all statements made, whether pre[-] or post[-] Miranda must be suppressed." The defense argued that Pitts was in custody from the beginning of police contact with him and that the failure to give Miranda warnings required the suppression of all statements made until the warnings were given. The defense also focused on the impropriety of the use of the "Christian burial speech." The defense further argued that the post-Miranda statements should be suppressed because Pitts had unequivocally invoked his right to remain silent after the warnings were given.
The State took the position that Pitts was not in custody until he had been arrested, that there had been no coercion in his interrogation, and that his statements were given freely and voluntarily. The State also argued that Pitts did not unequivocally invoke his right to counsel. Specifically, the State contended that "because [Pitts had] been cooperating up to [the] point" in the final taped interview when he answered "[n]o sir" after being asked if he was willing to speak with the officers, the "officers need[ed] to clarify. . . whether or not [Pitts] was willing to agree to continue to talk to them."
The trial court ruled that the interrogation of Pitts did not become a custodial interrogation until Pitts became aware that the bodies of the victims had been discovered. The trial court took the view that until the bodies were found, there was no corpus delicti. The court reasoned that until that point, the police lacked probable cause to arrest Pitts and that a reasonable person in Pitts' position therefore would have believed that he was free to terminate the interrogation and leave the presence of the police. On that basis, the trial court denied the motion to suppress with respect to the statements made by Pitts prior to the discovery of the bodiesthat is, "all statements made by [Pitts] during *1122 the non-custodial [sic] pre-Miranda encounters with law enforcement."
The trial court went on, however, to grant the motion to suppress with respect to the statements made by Pitts after he had been advised of his Miranda rights during the final taped interview. The trial court concluded that Pitts had at the outset of the taped interview unequivocally invoked his right to remain silent and that his subsequent statements to the police therefore should be suppressed. The trial court also determined that the interrogating officers had used cajoling and trickery to obtain the waiver from Pitts after he had initially invoked his right to remain silent. The trial court took the view that the officer used cajoling and trickery when after Pitts' "[n]o sir" response the officer asked, "do you wish to talk to me now . . . [a]nd tell your side of the story." The trial court saw this question as predicated on the earlier deception concerning T.J.'s purported accusation against Pitts. In effect, the trial court concluded that based on these circumstances, the waiver was involuntary.

III. Argument on Appeal

The State contends that the trial court erred in concluding that Pitts was in custody prior to his arrest. The State also argues that even if Pitts was in custody during the final taped interview, his statements in that interview should not be suppressed. According to the State, in light of Pitts' expressed willingness to speak with the officers after his Miranda rights had first been read to him, the officers acted appropriately to clarify Pitts' "[n]o sir" response: "The fact that [Pitts] previously was read Miranda and signed a waiver . . . and then answer[ed] `no sir' when asked if he wished to speak with the officer indicates a need for further inquiry on the part of the officers." The State contends that Pitts' waiver of his Miranda rights was given voluntarily and that nothing done by the officers rendered the waiver involuntary.
In response, Pitts argues that the "[n]o sir" response was an unequivocal invocation of his right to remain silent and that the police were required to terminate the interview once Pitts had uttered the words "[n]o sir." Pitts also argues that the use of trickery and deception by the officers rendered any waiver invalid. In addition, Pitts contends that under Missouri v. Seibert, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), the Miranda warnings were rendered ineffective by the custodial interrogation that preceded the giving of the warnings.
With respect to the cross-appeal, Pitts contends that all his statements made to the police before the Miranda warnings were given should be suppressed because those statements were made during a custodial interrogation. Pitts argues that he was taken into custody by the officers at his apartment and that the whole series of interviews involved custodial interrogation. Pitts relies on the fact that he was never informed by the officers that he was free to leave. He argues that the conduct of the officers in confronting him with evidence of his guilt throughout the interrogation militates against the trial court's conclusion that the pre-Miranda interrogation was noncustodial. Pitts also asserts that the officers' coercive and deceptive conduct during the course of the interrogation supports the conclusion that Pitts was in custody. In support of this point, Pitts focuses in particular on the accusation related to Pitts that "T.J. says Sammy killed these guys." In further support of the claim that he was in custody, Pitts claims that the officers made improper use of "a close version of the `Christian burial' speech" in the interrogation.
*1123 The State responds to the cross-appeal issues by arguing that there is no evidence that the officers' conduct was coercive or otherwise improper. The State contends that a reasonable person in Pitts' position would not have concluded that he was not free to leave the interrogation and that the encounter therefore cannot properly be considered a custodial interrogation. The State also argues that the references in the interrogation to the proper burial of the victims do not require suppression of Pitts' statements.

IV. Analysis

In addressing the issues raised by the appeal and cross-appeal, we confront four questions: (1) Was Pitts in custody during the extended interrogation that was conducted prior to his formal arrest? (2) Did Pitts invoke his right to remain silent after he was read his Miranda rights? (3) Did Pitts give a voluntary waiver of his Miranda rights? (4) Were the Miranda warnings given to Pitts effective under Seibert? Pitts' cross-appeal turns on the first question, and the State's appeal turns on the remaining questions. Based on the chronological sequence, we first address the question on which the cross-appeal turns.

A. Custodial Interrogation

(1) General Principles

Under Miranda v. Arizona, 384 U.S. 436, 476, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), statements made to the police in the course of a "custodial interrogation" must be suppressed if the police have not informed the suspect of his constitutional rights prior to the interrogation.[5] In determining "whether a suspect is `in custody' for purposes of receiving of Miranda protection, the ultimate inquiry is simply whether there is a `formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (quoting Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977)). Whether a suspect has been subjected to such a restraint on freedom of movement depends on "how a reasonable [person] in the suspect's position would have understood his situation." Berkemer v. McCarty, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).
The mere fact that "questioning takes place in the station house" or that "the questioned person is one whom the police suspect" does not mean that a suspect is in custody. Mathiason, 429 U.S. at 495, 97 S.Ct. 711. If an interrogating officer's "views or beliefs" regarding "the potential culpability" of the suspect are "manifested" to the suspect and affect "how a reasonable person in that position would perceive his or her freedom to leave," the expressed view of the officer "may be one among many factors that bear upon the assessment whether that individual was in custody." Stansbury v. California, 511 U.S. 318, 320, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). But "[e]ven a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue." Id. Whether a suspect is in custody "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being *1124 questioned." Id. See also Yarborough v. Alvarado, 541 U.S. 652, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) (holding that (a) state court did not unreasonably apply federal law when it failed to consider suspect's age in determining custodial status; (b) suspect's history with law enforcement is not a factor that is relevant to determination of custodial status under Miranda).
In Ramirez v. State, 739 So.2d 568, 574 (Fla.1999), the Florida Supreme Court employed a "four-factor test" as a guide for determining whether a suspect is in custody for purposes of Miranda.[6] Under the Ramirez test, "the determination [of] whether a reasonable person in the suspect's position would consider himself in custody" requires consideration of: "(1) the manner in which police summon the suspect for questioning; (2) the purpose, place, and manner of the interrogation; (3) the extent to which the suspect is confronted with evidence of his or her guilt; (4) whether the suspect is informed that he or she is free to leave the place of questioning." 739 So.2d at 574. See also State v. Alioto, 588 So.2d 17, 18-19 (Fla. 5th DCA 1991) (enumerating "three situations in which a reasonable person might believe he or she was not free to leave: if an officer (1) brandished a weapon, (2) touched the suspect, or (3) used language or a tone indicating compliance could be compelled" (citing United States v. Long, 866 F.2d 402 (11th Cir.1989))).
In considering the light shed by the Ramirez factors on whether a reasonable person in the suspect's position would have considered himself to be in custody, the four-factor test must be understood as simply pointing to components in the totality of circumstances surrounding an interrogation. "In order for a court to conclude that a suspect was in custody, it must be evident that, under the totality of the circumstances, a reasonable person in the suspect's position would feel a restraint of his or her freedom of movement, fairly characterized, so that the suspect would not feel free to leave or to terminate the encounter with police." Connor, 803 So.2d at 605 (emphasis added); see also Beheler, 463 U.S. at 1125, 103 S.Ct. 3517 (recognizing that "the circumstances of each case must certainly influence a determination of whether a suspect is `in custody' for purposes of receiving of Miranda protection").
No factor on the Ramirez list of factors can be considered in isolation. The whole context must be considered. A factor that would militate strongly toward the conclusion that a suspect was in custody in one context might be viewed differently in a materially different factual context. The focus of the inquiry must remain on whether a reasonable person in the suspect's positiongiven all the relevant circumstanceswould have understood himself to be in custody.

(2) Application of Law

(a) Advice Concerning Freedom to Leave

We begin our evaluation of the totality of the circumstances with an acknowledgment that the interrogating officers never expressly advised Pitts that he was "free to leave the place of questioning." We also recognize that Pitts was never advised that he was not free to leave. Furthermore, this is not a case where the police advised a suspect that they were determined to complete the questioning of the *1125 suspect in a way that suggested the suspect was not free to leave. See Mansfield v. State, 758 So.2d 636, 644 (Fla.2000) ("[O]ne of the detectives made it clear that Mansfield was not free to leave: `You and I are going to talk. We're not going to leave here until we get to the bottom of this.'").
Although it is certainly true that a suspect who has been advised that he is free to leave is less likely to be deemed to be in custody than a suspect who has not been so advised, the absence of such advice does not establish that the interrogation was custodial. See Roman v. State, 475 So.2d 1228, 1231 (Fla.1985) (stating that whether suspect is advised he was not under arrest is a "factor . . . to be considered as a circumstance that has bearing on a suspect's perception of his situation, but that it . . . is not dispositive"); State v. Scott, 786 So.2d 606, 610 (Fla. 5th DCA 2001) (holding that "[a]lthough [police] did not tell [defendant] she was free to leave, there [was] nothing to suggest that her freedom of movement was curtailed in any manner").

(b) The Manner in Which the Suspect was Summoned for Questioning

Here, the "manner in which the police summon[ed] [Pitts] for questioning" does not indicate that Pitts was in custody. Pitts was simply asked if he would "mind coming on down to the substation." Before accompanying the officers, Pitts was allowed to go back into his apartment unsupervised by the officers, while the officers waited outside the apartment. Pitts was not in any way subject to any physical restraint. Pitts took a seat as a passenger in the front seat of the police vehicle, which is not ordinarily the position of a person in custody. He "was never told that he had to go to the [substation], and he never indicated that he did not want to go." Cillo v. State, 849 So.2d 353, 355 (Fla. 2d DCA 2003); see also Bedoya v. State, 779 So.2d 574, 579 (Fla. 5th DCA 2001).
Although the fact that the officers came to Pitts' apartment in the early morning hours suggests an urgency in their mission, such an impression of urgency did not in itself subject Pitts to a restraint on his freedom. The timing of the officers' request that Pitts talk with them would not be understood by a reasonable person in Pitts' situation as suggesting that he had no choice but to accompany the officers. See Duddles v. State, 845 So.2d 939, 940, 942 (Fla. 5th DCA 2003) (holding that interrogation was noncustodial where police arrived at defendant's house at 3:50 a.m.).
The circumstances surrounding the manner in which the interrogation of Pitts was initiated are quite similar to the circumstances in Connor, 803 So.2d at 603:
The police [who went to Connor's residence at 2 a.m.] did not go to the house to arrest Connor; they only went to the house to question him. When Mrs. Connor answered the door, [the detectives] told her that they wanted to speak to Mr. Connor. Mr. Connor came out of the bedroom wearing pajamas, and [one of the detectives] told Mr. Connor that she "needed to further talk to him" at her office. Mr. Connor asked if he could get dressed[,] and he was given permission to do so. [One of the detectives] stated that Mr. Connor voluntarily agreed to go to the station. . . . Mr. Connor sat in the front seat and was not handcuffed.
Based on these circumstances, the supreme court held that "Connor was not in police custody when he left to go to the station." Id. at 608. Connor strongly supports the State's position that Pitts was not taken into custody by the officers at his apartment.

*1126 (c) The Purpose, Place, and Manner of the Interrogation

"[T]he purpose, place, and manner of the interrogation" is, of course, a multifaceted factor which encompasses the circumstances of the context in which the interrogation is conducted. Scott, 786 So.2d at 608. Admittedly, the location of the interrogationin two substations of the sheriff's department and in a department vehicleis a circumstance that is consistent with a custodial interrogation. Most custodial interrogations take place in a police station, and a defendant's presence in a station while subjected to questioning undoubtedly can have a bearing on how a reasonable person in the defendant's situation views his status. But, as we have already discussed, the circumstance that "questioning takes place in the station house" is not sufficient to establish that a suspect was in custody. Mathiason, 429 U.S. at 495, 97 S.Ct. 711. See also Roman, 475 So.2d at 1231 ("That an interrogation takes place at a station house does not by itself transform an otherwise noncustodial interrogation into a custodial one."); Noe v. State, 586 So.2d 371, 381 (Fla. 1st DCA 1991) ("Appellant was asked to go to the station. That does not automatically mean that she was taken into custody.").
The purpose of the interrogation of Pitts likewise does not support the conclusion that Pitts was in custody. From its inception, the purpose of the interrogationas it would be understood by a reasonable person in Pitts' situationwas primarily to obtain information that would locate the young men who had been reported missing. Unquestionably intertwined with that primary purpose was the additional purpose of determining who was responsible for the disappearance of the young men. Such a purpose might lead the police to taking a suspect into custody but that is by no means a necessary consequence. See Scott, 786 So.2d at 610-11 (statement that "`police questioning about criminal conduct or activity alone'" does not establish that a custodial interrogation was conducted (quoting Ramsey v. State, 731 So.2d 79, 81 (Fla. 3d DCA 1999))).
As to the manner of the interrogation, the record is clear that the officers did not in any way subject Pitts to force. There is no indication that the officers ever touched Pitts. He was never handcuffed, and he was never locked in a room. The officers conducted the interrogation in a conversational tone. They did not raise their voices or otherwise speak to Pitts in an intimidating manner. "The atmosphere of the interview was conversational, and no threats or promises were made." Cillo, 849 So.2d at 356.
The efforts of the officers to appeal to Pitts' conscience or to play on his emotions do not suggest that the interrogation of Pitts was custodial. Those efforts were not conducted in a manner that would lead a reasonable person in Pitts' situation to understand that he was not free to terminate the interview and leave the presence of the police. The fact that Pitts at certain points in the interrogation displayed emotion does not show that a reasonable person in his situation would have understood that he was in custody. Interviews with the police concerning serious crimes are not unlikely to bring forth emotional responses from the interviewees. But the fact that a person who is being interviewed sheds some tears does not establish that a reasonable person in the interviewee's situation would understand himself to be in custody.
The extended length of the pre-Miranda interrogation processwhich began around 4:20 a.m. and concluded at about 1:00 p.m.is relevant to whether Pitts was in custody. The length of the interview is, *1127 however, attributableat least in partto Pitts' voluntary efforts to assist the officers in finding the missing victims. In the context of the purpose of the interview, Pitts' acknowledgment of some knowledge concerning the location of the victims, and Pitts' ostensible desire to assist the officers in finding the victims, the length of the interview does not suggest that Pitts was in custody.
In support of the argument that the interrogation was conducted in a manner which suggests that Pitts was in custody, Pitts points to the use by the officers of "a close version of the `Christian burial' speech." The use of the "Christian burial technique" by interrogating officers is a circumstance that may have a bearing on the voluntariness of a confession. Roman, 475 So.2d at 1232-33. But a confession will not be considered involuntary based on the use of the Christian burial technique if "the use of this tactic did not directly result in" the confession. Id. at 1232; see also Lukehart v. State, 776 So.2d 906, 920 (Fla.2000). Even where the technique has been used and is determined in context to be a "blatantly coercive and deceptive ploy," a confession that follows will not necessarily be considered involuntary. Roman, 475 So.2d at 1232.
A simple appeal for a suspect's assistance in finding a victim's body for the sake of the victim's family will not render a confession involuntary. See Nelson v. State, 850 So.2d 514, 524 (Fla.2003) ("Although [the interrogating officer] asked [defendant] to put himself in the shoes of the victim's family and mentioned the need for a `proper burial,' when those statements are viewed under the circumstances of the interview it appears that the burial speech was not patently coercive."); Smithers v. State, 826 So.2d 916, 925 (Fla. 2002) (holding that officers' "reference to finding the body so that it could be buried [was] insufficient to make an otherwise voluntary statement inadmissible"); Alston v. State, 723 So.2d 148, 155 (Fla.1998) (holding that detective's "statement that [the defendant] should show them where the body was located because [the victim's mother] needed closure" did not render an "otherwise voluntary statement inadmissible"); Hudson v. State, 538 So.2d 829, 830 (Fla.1989) (holding that police "sergeant's reference to finding the body so that it could be buried [was] insufficient to make an otherwise voluntary statement inadmissible"). Nonetheless, when "the police inject Christianity or any other religion into" an interrogation, the potential for coercion is enhanced. Nelson, 850 So.2d at 524; see also Johnson v. State, 660 So.2d 637, 643 (Fla.1995).
Here there was no reference to a Christian burial by the interrogating officers and no appeal to Pitts' religious beliefs. There is nothing to separate the circumstances present here from the circumstances in the numerous cases where a simple appeal for assistance in locating a victim's body was found insufficient to render a confession involuntary. In any event, the officers' use of an appeal for assistance from Pitts to locate the bodies of the victims so that they could receive a proper burial is not a circumstance that would cause a reasonable person in Pitts' situation to understand that he was in custody. Pitts' argument concerning the Christian burial technique is unavailing.

(d) Confrontation with Evidence of Guilt

Although not necessarily dispositive, "the extent to which the suspect is confronted with evidence of his or her guilt" can be a circumstance that weighs heavily in the balances. A reasonable person in the situation of a suspect who has been "confronted with evidence strongly *1128 suggesting his guilt" may well understand that such evidence means that the police will not allow the suspect to go on his way. Mansfield, 758 So.2d at 644. A reasonable person understands that the police ordinarily will not set free a suspect when there is evidence "strongly suggesting" that the person is guilty of a serious crime. That does not mean that whenever a suspect is confronted with some incriminating evidence, the suspect is in custody for purposes of Miranda. The significance of this factor turns on the strength of the evidence as understood by a reasonable person in the suspect's position as well as the nature of the offense. If a reasonable person in the suspect's position would understand that the police have probable cause to arrest the suspect for a serious crime such as murder or kidnapping,[7] that circumstance militates strongly toward the conclusion that the suspect is in custody.[8]
In connection with this factor, Pitts relies primarily on the fact that he was confronted with the claim that T.J. had accused him of killing the victims and told by Captain Martin that "you and I both know that . . . you were there." Pitts was presented with nothing specific beyond this. Being confronted with the bare uncorroborated accusation that he had killed the victimswithout any details concerning how, when, or where the crime was committeddid not, however, constitute a "confron[tation] with evidence strongly suggesting his guilt." Mansfield, 758 So.2d at 644. A reasonable person understands that ordinarily the police do not take a suspect into custody on the basis of a potentially self-serving accusation that is unsupported by any details concerning the circumstances of the crime.
Martin did not specifically say that he believed the accusation made by T.J. was true. That circumstance would tend to lessen the impact of the accusation on a reasonable person in Pitts' situation. The indirect manner in which the accusation was presented to Pitts would also suggest to such a reasonable person that the police were not prepared to take Pitts into custody based on the accusation. Although Martin told Pitts of his suspicion that Pitts was "there," this is not a case where the questions and comments of the officers "made it readily apparent that the detectives considered him the prime . . . suspect." Id. And even if a reasonable person in Pitts' position would have understood from what the officers said that Pitts was "a prime suspect," that would not be, "in itself, dispositive of the custody issue." Stansbury, 511 U.S. at 320, 114 S.Ct. 1526.
The statements made to Pitts by Martin would no doubt cause a reasonable person in Pitts' situation to be concerned about where the ongoing investigation might lead. But we conclude that those statements would not lead a reasonable person in Pitts' circumstances to understand that he was in custody.[9]See Schoenwetter, 931 *1129 So.2d at 867 (holding that although defendant "was confronted with some evidence which implicated him in the murders" namely, "that there was a blood trail which led from the victim's house to his house and he had a cut on his hand"defendant was not in custody during interrogation). The fact that the statement concerning T.J.'s accusation against Pitts was false has no logical bearing on the impact the statement would have on a reasonable person in Pitts' situation.

B. Conclusion Regarding Pitts' Cross-Appeal

The trial court concluded that Pitts' status did not become custodial until he learned that the bodies of the missing young men had been found. Pitts has presented no argument which provides a basis for reversing the trial court's ruling on that point. None of the circumstances concerning the interrogation to which Pitts points are sufficienteither individually or collectivelyto establish that Pitts was in custody prior to the point determined by the trial court to mark the beginning of Pitts' custodial status. We therefore affirm the trial court's denial of the motion to suppress with respect to the statements made by Pitts prior to the giving of Miranda warnings.[10]

C. Invocation of the Right to Remain Silent

(1) General Principles

In Miranda, 384 U.S. at 473-74, 86 S.Ct. 1602, the Court stated:
Once warnings have been given, . . . [i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. . . . Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.
In Michigan v. Mosley, 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (quoting Miranda, 384 U.S. at 474, 479, 86 S.Ct. 1602), the Court further explained "that the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his `right to cut off questioning' was `scrupulously honored.'" The Court held that where a defendant had invoked his right to remain silent after being arrested on one charge, the police were not precluded from two hours later initiating another interrogation concerning an unrelated offense after once again advising the defendant of his Miranda rights. The Court noted that the case before it was not one "where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind." 423 U.S. at 105-106, 96 S.Ct. 321; see also Globe v. State, 877 So.2d 663, 670 (Fla.2004) (applying Mosley to uphold "second questioning" involving the same crime where defendant had earlier invoked his right to remain silent by stating "that he did not want to make a statement `at this time'").
In Smith v. Illinois, 469 U.S. 91, 91-92, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984), the Court held that after the suspect "clearly had requested the assistance of counsel," his subsequent "responses to further interrogation may not be used to cast doubt on *1130 the clarity of his initial request for counsel." Concluding that the lower courts had erred in determining that Smith's request for counsel was ambiguous, the Court observed: "The courts below were able to construe Smith's request for counsel as `ambiguous' only by looking to Smith's subsequent responses to continued police questioning and by concluding that, `considered in total,' Smith's `statements' were equivocal." Id. at 97, 105 S.Ct. 490 (quoting People v. Smith, 102 Ill.2d 365, 80 Ill.Dec. 784, 466 N.E.2d 236, 240 (1984) (emphasis added)). The Court held this to be impermissible, stating: "Where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease." Id. at 98, 105 S.Ct. 490 (emphasis added).
In Davis v. United States, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the Court rejected the argument that law enforcement officers should be required "to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney." The Court stated that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." Id. at 459, 114 S.Ct. 2350. Accordingly, in order for a suspect effectively to invoke his right to counsel, "he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Id.
The principle articulated in Davis with respect to the invocation of the right to counsel has been applied by the Florida Supreme Court with respect to the invocation of the right to remain silent. In State v. Owen, 696 So.2d 715, 717 (Fla.1997), the court recognized that "under Davis police are under no obligation to clarify a suspect's equivocal or ambiguous request and may continue the interrogation until the suspect makes a clear assertion of the right to counsel." The Owen court held that "Davis applies as much to requests to terminate interrogation as it does to requests for counsel." Id. at 718.
"A suspect must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent. If the statement is ambiguous or equivocal, then the police have no duty to clarify the suspect's intent, and they may proceed with the interrogation."
Id. (quoting Coleman v. Singletary, 30 F.3d 1420, 1424 (11th Cir.1994)).

(2) Application of Law

Here, the trial court held that Pitts unequivocally invoked his right to remain silent when he initially responded "[n]o sir" after he was asked if he was willing to speak to the interrogating officer during the final taped interview. We conclude that the trial court erred in determining that the interrogating officers were unjustified in seeking to clarify the response. Since Pitts had just agreed to talk with them, the officers would understandably be surprised or confused by the "[n]o sir" response. When viewed in the context of Pitts' immediately preceding agreement to talk with the officers, a "reasonable police officer in the circumstances" would have been justified in believing either that Pitts had misunderstood the question, that Pitts had misspoken in response to the question, or that the officer had misunderstood the response. Owen, 696 So.2d at 718. The ambiguity or *1131 uncertainty arose not from the words of the responsewhich in themselves admittedly are not ambiguousor from Pitts' "subsequent responses to continued police questioning" but from "the circumstances leading up to" Pitts' utterance of that response. Smith, 469 U.S. at 97-98, 105 S.Ct. 490.
Given the uncertainty arising from the circumstances leading up to the initiation of the final taped interview, the officers were justified in seeking to clarify Pitts' intentions. In such circumstances, clarifying the intentions of the suspect is both warranted and necessary. In asking the clarifying questions, the officers did not "fail[ ] to honor a decision of a person in custody to cut off questioning . . . by refusing to discontinue the interrogation upon request." Mosley, 423 U.S. at 105, 96 S.Ct. 321. Nor did the officers "persist[ ] in repeated efforts to wear down [Pitts'] resistance and make him change his mind." Id. at 105-06, 96 S.Ct. 321.
A similar scenario was addressed by the Eleventh Circuit in Medina v. Singletary, 59 F.3d 1095 (11th Cir.1995). In that case, after Medina had been read his Miranda rights, he "indicated that he understood his rights and that he was willing to talk with the detectives." 59 F.3d at 1102. "Following [a] lengthy preliminary conversation with Medina," the officers started a tape recorder, readvised Medina of his rights, and "asked Medina if he wanted to talk to the detectives." Id. When Medina "responded in the negative,"that is, said "no"a detective "immediately asked, `You don't want to talk to us or you do want to talk to us?' because . . . he `wasn't too sure what [Medina] meant by no [and] asked him to clarify it.' Medina then indicated that he wanted to continue the interview." Id.
The court rejected the defense argument that it "should adopt a per se rule that a suspect's response of `No' when asked if he wants to talk to a police officer means the officer cannot go forward with questioning." Id. at 1104. The court concluded that Medina's "No" had to be evaluated in light of his prior expression of a desire to talk with the police: "Taking into consideration the events preceding Medina's response, Medina's `No' was ambiguous and did not clearly indicate his desire to remain silent." Id. at 1105. "To prohibit a clarifying question under [these] circumstances . . . would `transform the Miranda safeguards into wholly irrational obstacles to legitimate police investigative activity.'" Id. (quoting Mosley, 423 U.S. at 102, 96 S.Ct. 321). See also Peña v. State, 98 P.3d 857, 868 (Wyo.2004) ("At the very least, clarification of an ambiguous affirmative invocation of the right to silence is permissible and good police practice. The law enforcement officers conducting the interview of [the defendant] did not ask any questions regarding the murder investigation until they had clarified whether [the defendant] was willing to talk to them.").
We agree with the reasoning of Medina, and we therefore hold that the trial court erred in ruling that Pitts invoked his right to remain silent. Invocation of the right to remain silent thus was not a proper basis for the suppression of Pitts' post-Miranda statements.

D. Voluntariness of the Miranda Waiver

Determining whether a defendant's waiver of Miranda rights was validthat is, "made voluntarily, knowingly and intelligently," Miranda, 384 U.S. at 444, 86 S.Ct. 1602, requires a two-part inquiry:
First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, *1132 coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal[s] both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.
Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (quoting Fare v. Michael C., 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979)). "[T]he State need prove waiver [of Miranda rights] only by a preponderance of the evidence." Colorado v. Connelly, 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). The "voluntariness of a waiver" of Miranda rights "depend[s] on the absence of police overreaching." Id. at 170, 107 S.Ct. 515. "Miranda protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that." Id.
Miranda, 384 U.S. at 476, 86 S.Ct. 1602, itself recognized that "any evidence that the accused was threatened, tricked, or cajoled into a waiver will . . . show that the defendant did not voluntarily waive his privilege." Nevertheless, in evaluating whether there was an "uncoerced choice," Burbine, 475 U.S. at 421, 106 S.Ct. 1135 (emphasis added), to waive Miranda rights, an act of trickery or cajolery by the police must be considered as an element in the totality of the circumstances. The determination of whether a waiver of rights is voluntary involves considerations similar to those at issue in the determination of whether a confession itself was voluntary. See Haynes v. Washington, 373 U.S. 503, 514, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963) (holding that facts established that confession "was obtained under a totality of circumstances evidencing an involuntary written admission of guilt").
"[M]ere misstatements of fact by the police or withholding of information by police does not mean a waiver was not knowingly and intelligently made, unless the misstatements or silence affect the defendant's ability to understand the nature of those rights he waived and the consequences of abandoning them." State v. Mallory, 670 So.2d 103, 106 (Fla. 1st DCA 1996) (citing State v. Manning, 506 So.2d 1094, 1096 (Fla. 3d DCA 1987)); see also State v. Wallace, 673 So.2d 914, 915-16 (Fla. 2d DCA 1996) (following reasoning of Manning to uphold validity of confession). And just as mere misrepresentations by the police do not mean that a waiver was not made with "the requisite level of comprehension," such misrepresentations do not mean that a waiver was not "an uncoerced choice." Burbine, 475 U.S. at 421, 106 S.Ct. 1135.
This line of analysis with respect to the waiver issue parallels the analysis employed in determining the bearing of police misrepresentations on the validity of confessions. "[P]olice misrepresentations alone do not necessarily render a confession involuntary." Fitzpatrick v. State, 900 So.2d 495, 511 (Fla.2005); see also Frazier v. Cupp, 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (holding that where interrogating officer had falsely told defendant that his cousinwho had been in defendant's company on night of alleged crimehad confessed to crime, police misrepresentation of facts "while relevant" was "insufficient . . . to make [an] otherwise voluntary confession inadmissible"); Johnson v. State, 921 So.2d 490, 505 (Fla.2005) (stating that the "[Florida Supreme Court] and the United States Supreme *1133 Court have held that police officers are permitted to falsely inform suspects regarding the evidence they have against them"). "[S]uch tactics can," however, "go too far and can render confessions so unreliable that they must be suppressed." Escobar v. State, 699 So.2d 984, 987 (Fla. 1997), abrogated on other grounds by Connor, 803 So.2d at 607.
We conclude that the record does not support Pitts' argument that his Miranda waiver was rendered involuntary by the conduct of the interrogating officers. As discussed above with respect to the issue of whether the interrogation was custodial, the officers did not speak to Pitts in an intimidating manner or engage in any other coercive conduct. To the extent that deception was used in the course of the interrogation prior to Pitts' waiver of his rights, that deception was not a sufficient ground for concluding that the waiver was invalid. The passing reference by the officers to Pitts' telling his "side of the story"even when viewed in the context of the preceding act of deceptionwas not sufficient to show that Pitts' waiver was coerced. Nor does the length of the interrogation suggest police coercion. Pitts was questioned only during portions of the nine-hour period, and the officers provided him with food and allowed him a bathroom break. See Perez v. State, 919 So.2d 347, 361-62 (Fla.2005) (holding that length of interrogation did not require suppression of statement where defendant was provided food, breaks, and opportunity to sleep during twenty-five hour period). In sum, nothing in the conduct of the police here shows that Pitts' waiver resulted from a coerced choice. The State has met its burden of establishing the voluntariness of the waiver.

E. The Effectiveness of the Miranda Warnings: The Seibert Issue

(1) A Tipsy Coachman Issue

The State has shown that the trial court's reasoning in suppressing the post-Miranda statements was erroneous. However, under the tipsy coachman doctrine, the trial court's suppression of the post-Miranda statements made by Pitts must be affirmed if the record before us establishes a proper basis for the trial court's rulingeven if the specific grounds articulated by the trial court were erroneous, see Robertson v. State, 829 So.2d 901, 906-07 (Fla.2002); Dade County School Board v. Radio Station WQBA, 731 So.2d 638, 644-45 (Fla.1999), and even if the specific basis for affirmance has not been articulated by the appellee, see Jaworski v. State, 804 So.2d 415, 419 (Fla. 4th DCA 2001).
In evaluating whether there is any basis for affirming the suppression of the post-Miranda statements, we are required to return to the issue of when Pitts' interrogation became custodial. Whether Pitts was in custody and made statements to the police prior to the administration of the Miranda warnings is relevant to whether the trial court's suppression of Pitts' post-Miranda statements should be affirmed based on the Supreme Court's decision in Missouri v. Seibert, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). Pitts' post-Miranda statements are potentially subject to suppression under Seibert if he had previously made statements during a custodial interrogation without the benefit of Miranda warnings.[11]

*1134 (2) The Impact of a Suspect's Confession on Custodial Status

Even though we agree with the trial court that Pitts was not in custody during most of the interrogation, we conclude that Pitts' status changed when he made a crucial admission. A suspect's confession of wrongdoing may result in a situation which a reasonable person would conclude is custodial. When a suspect gives a confession, the suspect is in effect confronted with his own words. A reasonable person understands that when a suspect confesses to committing a serious criminal act, the police ordinarily will not permit the suspect to go free. What begins as a noncustodial interrogation accordingly may be transformed into a custodial interrogation by a confession that the suspect utters during the interrogation. See State v. Linck, 708 N.E.2d 60, 63 (Ind.Ct.App.1999) (holding that defendant, who was being questioned regarding illegal drug use, was "in custody for purposes of Miranda after he admitted smoking the marijuana" because "a reasonable person would not have felt free to leave" after admitting "to engaging in illegal activity"); People v. Ripic, 182 A.D.2d 226, 587 N.Y.S.2d 776, 782 (N.Y.App.Div.1992) (holding that defendant, who was not in custody prior to incriminating statement, was in custody after statement because a reasonable person would not have believed that he or she was free to leave); Ruth v. State, 645 S.W.2d 432, 435-36 (Tex.Crim. App.1983) (interrogation of defendant at hospital where shooting victim was taken became custodial for purposes of Miranda once defendant admitted to the shooting).
Here, in the interview with Captain Martin, Pitts confessed that he had held a gun on the victims as they sat in the back seat of the car driven by T.J. Once that confession to the commission of a serious crime had been uttered, a reasonable person in Pitts' situation would have understood that he would not be allowed to go free. At that point, the interrogation became custodial and the protections afforded by Miranda became applicable.
We are unpersuaded by the trial court's conclusion that Pitts' status could not be custodial until the bodies of the victims were located. The trial court reasoned that without the bodies there was no corpus delicti and thus no probable cause for an arrest and no basis for a reasonable person in Pitts' situation to believe that he was not free to leave the interrogation. The law is clear, however, that where the police are investigating a case involving a missing person, they may obtain evidence which justifies an arrest prior to the discovery of the body of the missing person. See Chavez v. State, 832 So.2d 730 (Fla. 2002) (holding in murder prosecution that police had probable cause to arrest the defendant in connection with kidnaping of child whose body had not been located).
The fact that the bodies of the missing young men had not been found when Pitts confessed to having held a gun on them as they were being abducted was no impediment to the arrest of Pitts for the crime to which he had confessed. It was not necessary for the police independently to establish the corpus delicti in order to have probable cause.[12]See State v. Jones, 198 Ariz. 18, 6 P.3d 323, 329 (2000) ("Different from a determination of probable cause, the corpus delicti rule involves a finding. . . of independent evidence to support a conviction, not whether probable cause exists to support a criminal charge." (citation *1135 omitted)); see also J.B. v. State, 705 So.2d 1376, 1378 (Fla.1998) (stating that "the State cannot offer into evidence an admission against interest to prove an element of the charged offense in the absence of an independently established corpus delicti"). And the absence of independent proof of the corpus delicti would not prevent a reasonable person in Pitts' situation from understanding that the confession to holding a gun on the victims would mean that Pitts was no longer free to leave.

(3) Seibert and Its Application

In Seibert, 542 U.S. at 604, 124 S.Ct. 2601, the Court addressed "a police protocol for custodial interrogation that calls for giving no warnings of the rights to silence and counsel until interrogation has produced a confession." Seibert was decided against the backdrop of Oregon v. Elstad, 470 U.S. 298, 300, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), which considered "whether an initial failure of law enforcement officers to administer the warnings required by [Miranda], without more, `taints' subsequent admissions made after a suspect has been fully advised of and has waived his Miranda rights." Elstad, 470 U.S. at 318, 105 S.Ct. 1285, held "that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings."
The Seibert Court distinguished Elstad and affirmed the suppression of the post-Miranda statements based on facts which "reveal[ed] a police strategy adapted to undermine the Miranda warnings." 542 U.S. at 616, 124 S.Ct. 2601. The decision to affirm the suppression of the post-Miranda statements was joined by five justices, but the Seibert court produced no majority opinion. The plurality opinion sets forth the views of four justices. Justice Kennedy, the fifth vote for affirmance, set forth his views in a separate opinion.
The Seibert plurality focused on
a series of relevant facts that bear on whether Miranda warnings delivered midstream could be effective enough to accomplish their object: [1] the completeness and detail of the questions and answers in the first round of interrogation, [2] the overlapping content of the two statements, [3] the timing and setting of the first and the second rounds, [4] the continuity of police personnel, and [5] the degree to which the interrogator's questions treated the second round as continuous with the first.
Id. at 615, 124 S.Ct. 2601.[13] Justice Kennedy's opinion concurring in the judgment concluded, however, that the test articulated by the plurality "cuts too broadly." Id. at 622, 124 S.Ct. 2601 (Kennedy, J., concurring). Justice Kennedy instead employed "a narrower test applicable only in the infrequent case . . . in which the two-step interrogation technique was used in a calculated way to undermine the Miranda warning." Id. Under Justice Kennedy's approach:
If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made. Curative measures should be designed to ensure that a reasonable person in the *1136 suspect's situation would understand the import and effect of the Miranda warning and of the Miranda waiver.
Id.
"When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (quotation marks omitted). Accordingly, the holding of Seibert should be viewed as the position taken by Justice Kennedy, which articulates the "narrowest grounds" for the judgment of the Court.
When we consider the interrogation of Pitts under the test articulated in Seibert by Justice Kennedy, we can readily conclude that Pitts' post-Miranda statements should not be suppressed. The record before us does not show that "the two-step interrogation technique was used in a calculated way to undermine the Miranda warning." Seibert, 542 U.S. at 622, 124 S.Ct. 2601 (Kennedy, J., concurring). The failure to give the Miranda warnings once Pitts confessed to holding a gun on the victims is most reasonably attributable to simple inadvertence on the part of the interrogating officers. There is nothing to suggest that the failure to advise Pitts of his rights at that juncture was in any way calculated. In this connection, we note that the defense also overlooked the significance of Pitts' confession to holding the gun on the victims.

F. Conclusion Regarding the State's Appeal

Based on our analysis of the reasons articulated by the trial court as well as the Seibert issue, we determine that there is no basis for affirming the trial court's ruling with respect to the post-Miranda statements. The trial court's ruling suppressing the post-Miranda statements therefore is reversed.

V. Summary

We reverse the ruling suppressing the statements made by Pitts in the final taped interview after the administration of the Miranda warnings. We affirm the ruling denying the suppression of the statements made prior to the administration of the Miranda warnings.
Affirmed in part; reversed in part.
FULMER, C.J., and KELLY, J., Concur.
NOTES
[1] The facts related to the interrogation of Pitts are based on the testimony of various officers who were involved in the interrogation. The record of the suppression hearing also includes the transcripts and the tape recordings of two taped interview sessions.
[2] With respect to these circumstances, the trial court's order states: "After the bluff had worked, the Defendant asked [Martin] if he (the Defendant) was under arrest. [Martin] did not answer yes or no, but told the Defendant that it `depends' upon subsequent events and what his (the defendant's) information and the consequential investigation eventually revealed." To the extent that this statement constitutes a finding that Pitts asked "if he . . . was under arrest," we conclude that it is not supported by the record. See Connor, 803 So.2d at 608. The undisputed testimony shows that the question asked by Pitts concerned what his status would be if he told the officer "what happened." The question did not refer to Pitts' status at the time the question was asked but to his hypothetical status following his hypothetical disclosure of "what happened."
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[4] Although the form on its left margin bears the legend "Miranda Waiver," the text of the form merely states that "I, Samuel Pitts, do hereby understand" the enumerated Miranda rights.
[5] Statements obtained in violation of Miranda may, however, be used to impeach a defendant. See Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). In addition, compliance with Miranda is not mandated when there is an imminent threat to the public safety and questions must be asked to obtain information necessary to avert that threat. See New York v. Quarles, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984).
[6] The Ramirez four-factor test was derived from a similar test adopted by the Supreme Court of Iowa. See State v. Countryman, 572 N.W.2d 553, 558 (Iowa 1997); State v. Deases, 518 N.W.2d 784, 789 (Iowa 1994).
[7] Law enforcement officers have probable cause to arrest a suspect when "the facts and circumstances within their knowledge and of which they [have] reasonably trustworthy information [are] sufficient to warrant a prudent man in believing that the [suspect has] committed . . . an offense." Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).
[8] If the suspect has been advised that he is not under arrest and is free to leave, the significance of this circumstance, of course, would be diminished.
[9] The same is also true of the confrontation of Pitts with his participation in the pawning of the victims' property and his involvement in the police chase. Pitts offered an innocent explanation of those matters, and he was confronted with nothing to refute that explanation. In such circumstances, a reasonable person in his position would not understand himself to be in custody.
[10] In our evaluation of whether there is any basis to affirm the trial court's ruling that is at issue in the State's appeal, we will be required to return to the question of when Pitts' status became custodial.
[11] Pitts has cited Seibert in his initial brief. He has not, however, demonstrated that there was a pre-Miranda custodial interrogation.
[12] We thus have no occasion here to determine whether the known circumstances prior to the discovery of the bodies were sufficient to show a corpus delicti for a crime related to the disappearance of the victims.
[13] Justice Breyer, who joined in the plurality opinion, also delivered an opinion in which he stated his view concerning the appropriate "simple rule" to apply to the "two-stage interrogation technique": "Courts should exclude the `fruits' of the initial unwarned questioning unless the failure to warn was in good faith." Id. at 617, 124 S.Ct. 2601 (Breyer, J., concurring).