NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

TAVIS LEE BELL,                                    )
                                                   )
            Appellant,                             )
                                                   )
v.                                                 )          Case No. 2D15-99
                                                   )
STATE OF FLORIDA,                                  )
                                                   )
            Appellee.                              )
                                                   )
_____)

Opinion filed October 28, 2016.

Appeal from the Circuit Court for Polk
County; Catherine L. Combee and Michael
E. Raiden, Judges.

Andrea M. Norgard of Norgard, Norgard &
Chastang, Bartow, for Appellant.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Susan M. Shanahan,
Assistant Attorney General, Tampa, for
Appellee.


WALLACE, Judge.

            Tavis Lee Bell appeals his judgment and sentences for multiple offenses

involving sexual conduct with children who were in his custody.  Mr. Bell challenges the

trial court's order denying his motion to suppress the second of two statements that he

made at a station house to the detectives investigating the case.  Because Mr. Bell was

subjected to custodial interrogation when he gave his second statement but he was never given the required Miranda[1] warnings, we reverse.

## I.  THE FACTS

### A.  Background

Mr. Bell has a familial relationship with the two minor victims, and he was their custodian.  Mr. Bell also has an adult son.  Mr. Bell moved to Polk County from another state with the minor children in September 2013.  His adult son joined the family in Florida in February 2014.

On April 29, 2014, Mr. Bell came to the attention of the Polk County Sheriff's Office after its Computer Crime Unit executed a search warrant and arrested Keith Randolph ("Randy") Crump, Jr., for possession of child pornography.  Mr. Crump confessed to having had sexual involvement with Mr. Bell and the two minor children in Mr. Bell's custody.  According to Detective Barry Schnable of the Special Victim's Unit, Mr. Crump "provided a very detailed interview about his sexual contact with the children and with Mr. Bell."

### B.  Initial Contacts with Law Enforcement

On the day of Mr. Crump's arrest, Detective Schnable located one of the children at school and took that child to the Children's Advocacy Center (C.A.C.) to be interviewed by the Child Protection Team (C.P.T.).  This child initially maintained that nothing had happened, and the child was eventually taken to the Polk County Sheriff's Operations Center in Winter Haven.

---

[1]Miranda v. Arizona, 384 U.S. 436 (1966).

Detective Chad McConchie with the Special Victim's Unit went to Mr. Bell's residence around 4:00 p.m. on April 29. Soon, Mr. Bell arrived at the residence with the other minor child. Detective McConchie "briefed" Mr. Bell on the investigation that Detective Schnable and he were conducting. Detective McConchie searched the house for cell phones and computers with Mr. Bell's permission, and he seized some cell phones and computers. Detective McConchie told Mr. Bell that he was not under arrest, and he did not advise Mr. Bell of his Miranda rights. Detective McConchie asked Mr. Bell if he would come to the operations center so that the detectives could continue with the investigation. Mr. Bell agreed to go to the operations center, and his adult son drove him there. The child who had arrived at the residence with Mr. Bell was also taken to the C.A.C. for a C.P.T. interview. During an initial interview, this child also denied that anything improper had occurred.

### C. Arrival at the Operations Center

The operations center is a large building that takes up an entire city block. About fifty to seventy-five people work there. Mr. Bell arrived at the operations center between 7:00 p.m. and 7:30 p.m. Before his initial interview, Mr. Bell sat in a conference room on the second floor of the operations center with his adult son. To get to the second-floor conference room where Mr. Bell and his adult son waited, they had to enter through a set of locked, double doors that required keycard access. Detective Schnable went to the conference room, introduced himself, and asked Mr. Bell if he could ask him some questions. Mr. Bell agreed, and they went into an interview room next to the conference room. Detective Schnable and Detective Anderson conducted Mr. Bell's first interview.

Detective Schnable advised Mr. Bell that he was not under arrest and that he was free to leave at any time. He explained that while they were in a secure building with doors locked on the outside, none of the doors were locked to exit the building. The door to the interview room was not locked, and Mr. Bell "could go out the double doors, down the elevator, and be outside." Once again, the detectives did not inform Mr. Bell of his Miranda rights.

### D. The First Interview

The first interview—conducted by Detectives Schnable and Anderson— began at 8:20 p.m. and lasted about forty minutes. During that interview, the detectives asked Mr. Bell about his relationship with Mr. Crump and Mr. Bell's relationship with the children. The detectives told Mr. Bell that there were accusations that Mr. Bell and Mr. Crump had engaged in sex with the children. Mr. Bell told the detectives that nothing of the sort had occurred. Mr. Bell specifically denied that he had ever engaged in sexual conduct with the children or that he had ever permitted anyone else to engage in sexual conduct with the children. He also denied showing the children pornography.

As the first interview progressed, Detective Schnable announced that someone was not being truthful with him and that he was going to find out the truth. Detective Schnable also warned Mr. Bell that he arrested people for lying to him. Then the detective assured Mr. Bell that he would not be arrested as long as he was telling the truth. Detective Schnable concluded the first interview by asking Mr. Bell to contact him if anything came up. Then Detective Schnable announced that he "just want[ed] to talk to [Mr. Bell's adult son] real quick and then we'll get you all out of here." Whatever Detective Schnable's intention may have been, this is not what in fact occurred. Mr. Bell

- 4 -

would wait at the station for more than two hours until Detective Schnable and Detective McConchie began his second interview.

### E.  Further Interviews with the Children

Next, the detectives interviewed Mr. Bell's adult son while Mr. Bell waited in the conference room.  After interviewing Mr. Bell and his adult son, Detective Schnable and Detective McConchie interviewed each of the children separately.  During these further interviews, the children disclosed that there had been sexual conduct "involving Mr. Crump and Mr. Bell."  They stated that "they had participated in sexual activity with [Mr. Bell] and Mr. Crump on several occasions at their residence and at Mr. Crump's residence."  Thus at the conclusion of the further interviews with the children, the detectives had heard two versions of events with obvious and substantial discrepancies between them: the first offered by Mr. Crump earlier that day and by the children in the further interviews at the operations center and the second offered by Mr. Bell in his first interview.

### F.  The Second Interview

While the detectives were conducting the further interviews with the children, Mr. Bell and his adult son waited in the conference room together.  Detective McConchie said that he offered Mr. Bell something to drink while he waited.

After concluding the further interviews with the children, Detective McConchie retrieved Mr. Bell from the conference room.  Detectives McConchie and Schnable asked Mr. Bell if he minded answering a few more questions.  Mr. Bell agreed.  Mr. Bell's second interview began at 11:15 p.m. and lasted about thirty-five minutes.  The detectives did not give Mr. Bell Miranda warnings before the second

interview, nor did Mr. Bell complete a consent to interview form. Although Detective Schnable told Mr. Bell that he was free to leave before the first interview, neither detective told him that before the second interview.

Mr. Bell testified at the suppression hearing that he had expressed the wish to leave before the second interview. Mr. Bell said that "one of the detectives came" into the conference room around 11:00 p.m. Mr. Bell asked what time it was and where the children were. The detective told him that the children were downstairs watching television. Mr. Bell told the detective, "They've been up since 6 o'clock this morning. Can we do this another time? I really need to go." The detective told him that it would be just a few more minutes and left. "[T]hen the other detective" entered the conference room and instructed Mr. Bell, "Follow me," and they went into another room.[2] At the hearing on the motion to suppress, Detectives Schnable and McConchie testified that they did not remember Mr. Bell making a request to leave. In the recorded portion of the second interview, Mr. Bell did not tell Detectives Schnable or McConchie that he wanted to leave. Mr. Bell testified that he did not reiterate his request to leave at the beginning of the recorded portion of the second interview because he thought the detectives would ask just a couple more questions. Mr. Bell further explained his failure to say anything about leaving on the tape stating, "And then [the detective's] very first statement made it obvious to me that I wasn't able to leave."

At the beginning of the interview, Detective Schnable asked Mr. Bell how he was doing. Mr. Bell answered, "I've been better." Then Detective Schnable asked

---

[2]When the trial court sought clarification about which detective Mr. Bell had asked to leave, Mr. Bell stated that "[t]here was a third detective there."

- 6 -

Mr. Bell, "Is there anything—I'll give you the opportunity to go ahead and tell me what I already know, okay? Because you haven't been honest with me. My investigation already proves that, and I have proof of that. So I need you to explain why this happened, how it happened." Mr. Bell responded, "I'm not sure what you're talking about." Detective McConchie replied, "What's going on with you and your boyfriend or ex-boyfriend Randy, okay? We already know a lot of details, okay? This is your one and only opportunity to explain this. If this was a forced encounter or was it manipulated or is this all consensual?"

After challenging Mr. Bell with their assertion that he had been lying and that they had proof that something inappropriate had happened, the detectives suggested that whether any contact had been consensual or instigated by Mr. Crump would make a difference to the outcome of the case. Detective McConchie reminded Mr. Bell that this was his "one and only chance" and that he didn't "want to see [Mr. Bell] paint [himself] into that corner that [he couldn't] get out of." Detective McConchie then added, "And usually when we ask these questions we already know the answer, okay?"

After being confronted with these exhortations to admit to what the detectives already knew had happened, Mr. Bell stated that he had taken the children to Mr. Crump's residence to play Xbox and that Mr. Crump brought out his computer and started showing him child pornography. After that, Mr. Bell stated, he and the children left. Detective McConchie then suggested to Mr. Bell that the children were good kids and that Mr. Bell would not want to accuse them of lying. He stated that what Mr. Bell had said wasn't the truth and that they could prove it. Detective Schnable added that "[t]hey've already told us everything." Nevertheless, Mr. Bell maintained that he had not

let anything happen and that he and the children had left. Detective McConchie repeated that they knew something happened based upon two explicit and independent statements from the children.

This line of questioning continued over several pages of the transcript of the interview. Then Mr. Bell began to admit to sexual conduct between the children and Mr. Crump that Mr. Bell initially minimized and then described in more detail.

Mr. Bell again denied that he had any sexual contact with the children, but the detectives told him that that was not what the children had told them. The detectives suggested that the older child had been curious and that Mr. Bell was "trying to provide [for] the needs [of a] curious, confused [teenager]." Detective McConchie continued to pursue this line of questioning, suggesting that any sexual contact between Mr. Bell and the children could be justified by the children's curiosity about sex. Finally, Mr. Bell admitted that he had engaged in sexual activity with both children. During the remainder of the second interview, the detectives clarified what Mr. Bell had told them, inquired about the dates of the events, and asked how it had all started.

## G. The Postscript

As the second interview concluded, the detectives must have known that Mr. Bell had made statements admitting to conduct that could send him to prison for the rest of his life. The detectives also knew that Mr. Bell had been at their operations center for interrogation for several hours,[3] but they had never informed him of his rights

---

[3]Detective Schnable testified at trial that Mr. Bell arrived at the operations center between 7:00 p.m. and 7:30 p.m. Thus when the detectives began Mr. Bell's second interview at 11:00 p.m., he had already been at the operations center for at least three and one-half to four hours.

under Miranda or obtained a signed consent to interview form. The detectives concluded the interview with the following statements:

> DETECTIVE SCHNABLE: Anything else that we should know about that we haven't talked about?
>
> THE DEFENDANT: No.
>
> DETECTIVE SCHNABLE: Anything we're going to find out later?
>
> THE DEFENDANT: No.
>
> DETECTIVE McCONCHIE: We didn't yell at you or scream at you, did we?
>
> THE DEFENDANT: No.
>
> DETECTIVE McCONCHIE: Okay. Treated you like a gentleman?
>
> THE DEFENDANT: Uh-huh.
>
> DETECTIVE McCONCHIE: And you drove up here, correct—voluntarily?
>
> THE DEFENDANT: Yeah.
>
> DETECTIVE McCONCHIE: And agreed to speak with us?
>
> THE DEFENDANT: Yeah.

The final questions propounded by the detectives appear to be intended to add a postscript to the interview in support of what the State would later claim was its noncustodial nature.

### H. The Arrest

The detectives concluded the second interview of Mr. Bell at approximately 11:50 p.m. The record indicates that Mr. Bell was formally arrested thirty minutes later at 12:20 a.m.

## II.  THE CHARGES

The State charged Mr. Bell with seven counts of sexual battery on a child between twelve and eighteen years old by a custodian, two counts of lewd or lascivious exhibition to a child under eighteen, two counts of showing obscene material to a minor, three counts of lewd or lascivious molestation of a child between twelve and sixteen years old, and three counts of sexual battery on a child under twelve.  The State alleged that Mr. Bell committed these crimes on or between October 1, 2013, and March 31, 2014.

## III.  THE PROCEEDINGS IN THE TRIAL COURT

After Mr. Bell was formally charged, he moved to suppress the second of his two statements to law enforcement because he had not been given Miranda warnings at any time.  Mr. Bell did not seek the suppression of his first statement.  The trial court held an evidentiary hearing on the motion.  At the hearing, Detective Schnable and Detective McConchie both admitted that they had never given the Miranda warnings to Mr. Bell.

In addition to hearing the testimony of the detectives and Mr. Bell, the trial court also listened to the recorded interviews.  The trial court then entered a written order denying the motion to suppress.  In its order, the trial court recognized that the dispositive issue was whether Mr. Bell was in custody such that Miranda warnings were required prior to questioning.  After making a number of factual findings, the trial court made the following ruling:

> First, Defendant's initial agreement to speak with the detectives was unquestionably voluntary.  He came to the substation of his own accord, in his own vehicle, after being expressly told he was not under arrest.  Second, once at the

substation neither the atmosphere nor the detectives' conduct was coercive. Defendant was informed that he could leave at any time. The detectives (never more than two at a given time) made no overt threats or promises, and their demeanor throughout the first interview was cordial. Third, there is no meaningful evidence that Defendant was coerced into making the second statement. He was advised beforehand that the detectives wanted to speak to his [adult] son first, whereupon he said, "All right." The Court has considered the impact of the protest supposedly made to a third officer, apparently unconnected with the investigation, about the lateness of the hour. There is no evidence his objections were made known to Detectives Schnabel [sic] and McConchie, either by the unidentified officer or Defendant himself. Had they been alerted to his remarks, and persisted in questioning, a different result might have been reached.

The trial court further considered Mr. Bell's statement that he believed he was no longer free to leave at the beginning of the second interview after Detective Schnable confronted him with his belief that Mr. Bell was lying and thus Mr. Bell believed that he would be going to jail no matter what he said. The trial court dismissed this testimony as Mr. Bell's subjective belief and found that it did "not compel the conclusion that a reasonable person under the same circumstances would have felt he had no choice and could not leave."

After the denial of his motion to suppress, the case against Mr. Bell went to trial. A jury found him guilty as charged on all seventeen counts. The trial court sentenced him to various terms of five, fifteen, and thirty years' prison and to three life sentences on each of the three counts of sexual battery on a child under twelve, which are capital felonies. All of the sentences were imposed to run concurrently. The trial court also determined that Mr. Bell is a sexual predator. This appeal followed.

- 11 -

## IV. THE LEGAL BACKGROUND

"In <u>Miranda</u>[ v. Arizona, 384 U.S. 436 (1966)], the United States Supreme Court established a procedural safeguard to protect an individual's fifth amendment privilege against compelled self-incrimination from the coercive pressures of custodial interrogation." <u>Caso v. State</u>, 524 So. 2d 422, 423 (Fla. 1988). The constitutional prohibition against compelling a person to bear witness against himself in a criminal matter is applicable during any period of custodial interrogation. <u>Ramirez v. State</u>, 739 So. 2d 568, 572-73 (Fla. 1999) (citing Amend. V, U.S. Const.; Art. I, § 9, Fla. Const.; and <u>Miranda</u>, 384 U.S. 436). "Thus, to be admissible in a criminal trial, the State must prove that [a] confession was not compelled, but was voluntarily made." <u>Id.</u> at 573. Here, the State argues that <u>Miranda</u> warnings were not required during Mr. Bell's second interview with law enforcement because he was not in custody. Thus, the State argues, the failure to advise Mr. Bell of his <u>Miranda</u> rights did not render his statement involuntary.

"The ultimate inquiry when determining whether a person was in custody [for purposes of <u>Miranda</u>] 'is whether "a reasonable person placed in the same position would believe that his or her freedom of action was curtailed to a degree associated with actual arrest." ' " <u>Killian v. State</u>, 761 So. 2d 1210, 1213 (Fla. 2d DCA 2000) (quoting <u>Mansfield v. State</u>, 758 So. 2d 636, 644 (Fla. 2000)). In <u>Ramirez</u>, the Florida Supreme Court adopted four nonexclusive factors to guide courts in making this determination:

> (1) the manner in which police summon the suspect for questioning; (2) the purpose, place, and manner of the interrogation; (3) the extent to which the suspect is confronted with evidence of his or her guilt; (4) whether the

suspect is informed that he or she is free to leave the place of questioning.

739 So. 2d at 574. The Ramirez factors are not to be considered in isolation. State v. Pitts, 936 So. 2d 1111, 1124 (Fla. 2d DCA 2006). Instead, "[t]he whole context must be considered." Id.

Because the circumstances of a suspect's encounter with the police are frequently fluid, the nature of such an encounter may change over time from noncustodial to custodial. "There is not necessarily a single specific comment, question, or circumstance that converts an encounter from noncustodial to custodial. A situation can commence as a voluntary interaction with police, but slowly intensify and become more pressured, pointed, and accusatory until it evolves into custodial status." State v. McAdams, 193 So. 3d 824 (Fla. 2016). The possibility of the evolution of a suspect's encounter with the police from noncustodial to custodial in a relatively short time requires the trial court to examine carefully the encounter in its entirety. In making this examination, the trial court should refuse to accept at face value the formulaic characterizations of events frequently offered by the parties after the fact.

Statements obtained in violation of Miranda may be used by the State for impeachment purposes. Pitts, 936 So. 2d at 1123 n.5 (citing Harris v. New York, 401 U.S. 222 (1971)). But "[b]efore a suppressed statement can be used for impeachment purposes, the statement must be shown to have been made voluntarily." Carlisi v. State, 831 So. 2d 813, 815 (Fla. 4th DCA 2002) (citing Nowlin v. State, 346 So. 2d 1020, 1024 (Fla. 1977)).

Whether an individual is in custody involves a mixed question of law and fact. Ramirez, 739 So. 2d at 574. We review the trial court's factual findings for

- 13 -

competent, substantial evidence, and we consider the trial court's application of the law to the facts de novo. Pitts, 936 So. 2d at 1117. With these principles in mind, we turn now to a consideration of whether the circumstances of Mr. Bell's second interview with the detectives were such as to render the interrogation custodial in nature. We will employ the four Ramirez factors as an organizational framework for our consideration of this issue. In addition, we will also discuss the detectives' stated reasons for failing to Mirandize Mr. Bell before beginning the second interview.

## V. THE CUSTODIAL NATURE OF THE SECOND INTERVIEW

### A. The Manner in which the Suspect was Summoned for Questioning

In this case, as noted by the trial court, Mr. Bell was not arrested before he arrived at the operations center. Instead, the detectives requested that he go to the operations center to assist them in their continuing investigation. Mr. Bell agreed to go to the operations center, and his adult son drove him there. Mr. Bell's acquiescence in a request to go to the operations center and his travel there in a private vehicle would not tend to cause a reasonable individual to believe that he or she was in custody. However, we note that at that point Mr. Bell knew there was an investigation being conducted involving children who were in his custody and Mr. Crump. He presumably knew that one of the children, who was with him at the house during the search, had been taken to the C.A.C. for an interview, and he presumably knew that the other child

- 14 -

was there too.  In addition, Mr. Bell knew that the detectives had seized cell phones and computers from his residence.

## B. The Purpose, Place, and Manner of the Interrogation

The location of the interviews at the sheriff's operations center does not establish that Mr. Bell was in custody.  See State v. Thompson, 193 So. 3d 916, 921 (Fla. 2d DCA 2016).  However, "a defendant's presence in a station while subjected to questioning undoubtedly can have a bearing on how a reasonable person in the defendant's situation views [his] status."  Id. (quoting Pitts, 936 So. 2d at 1126).[4]  In this case, the trial court found that the atmosphere and manner of questioning at the operations center was not coercive.  The undisputed facts support this conclusion with regard to the first interview but not the second.

Although Mr. Bell arrived at the operations center with his adult son and was permitted to sit with his son in a conference room between interviews, Mr. Bell was taken to a separate room for questioning outside of his adult son's presence.  Cf. id. (observing that the suspect's mother's presence during the interview made the circumstances of the interview less coercive).

Adding to the coercive nature of the circumstances was the presence at the operations center of children who were under Mr. Bell's care in what amounted to protective custody.  See State v. Shell, 932 So. 2d 628, 633 (Fla. 2d DCA 2006).  Although the detectives did not suggest or threaten that the children might be sheltered,

---

[4]The idea that an average person who is being interviewed by the police at a station house can feel "free" to terminate the interview and leave at any time has been aptly described as a "new legal fiction."  Peter J. Smith, New Legal Fictions, 95 Geo. L.J. 1435, 1458-59 (2007).

a reasonable person in Mr. Bell's situation would likely anticipate that the children would not be permitted to leave with him once he was confronted with evidence that he had engaged in some form of sexual contact with them and certainly not after he admitted to such contact. Cf. id. (observing that while the possibility that the defendant's children, who had come to the child protection team office with the defendant, might be sheltered added a coercive element to the circumstances of the mother's interview, she was being interviewed about abuse allegations against the father and was not told that the children would be sheltered). These factors, although not sufficient to cause the first interview to be custodial, are part of the totality of the circumstances that lead us to the conclusion that the second interview was custodial.

## C. The Extent of Confrontation with Evidence of Guilt

As an interrogation progresses, it can evolve from noncustodial into custodial. "[A]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." Thompson, 193 So. 3d at 921 (quoting California v. Beheler, 463 U.S. 1121, 1124 (1983)).

> The primary concern with a suspect being confronted with evidence of his or her guilt is that it generally leads a person to believe they are no longer free to go because law enforcement is unlikely to release a person who is suspected of committing a serious crime. When police confront the defendant with evidence that strongly suggests [his] guilt, the significant psychological impact on the defendant will diminish if the police do nothing to refute the defendant's explanation. Simply confronting a person with incriminating evidence of guilt does not by itself make for a custodial interrogation.

- 16 -

Rather, "[t]he significance of this factor turns on the strength of the evidence as understood by a reasonable person in the suspect's position as well as the nature of the offense." Pitts, 936 So. 2d at 1128.

Id. at 923 (second alteration in original) (citations omitted); see also McAdams, 193 So. 3d at 833 ("[A]lthough [the defendant] was not in custody initially, the encounter with the detectives steadily evolved into a custodial situation in which a reasonable person would not have felt free to terminate the interview and leave.").

The extent to which the detectives confronted Mr. Bell with evidence of his guilt during the second interview is the factor upon which we place the most weight. The consideration of this factor in the context of the totality of the circumstances leads us to conclude that Mr. Bell was subjected to custodial interrogation during the second interview. In the first interview, Detective Schnable told Mr. Bell that he might be arrested if Detective Schnable found out that he was lying. Notably, the first thing that Detective Schnable told Mr. Bell at the beginning of the second interview was that the detectives knew that he had lied and that they had the evidence to prove it. Then, Detective McConchie told Mr. Bell that this was his one and only chance to come forward with the truth. By any measure, these statements were highly coercive and confrontational. The detectives then challenged Mr. Bell with the claim that the children had independently told them "everything" and the same things. This followed the disclosure to Mr. Bell in the first interview that he had been accused by someone of having sex with the children and Mr. Crump. Every time that Mr. Bell withheld information or denied an assertion by the detectives, they contradicted him by stating that the children had told them otherwise. The highly coercive nature of this mode of interrogation—together with the surrounding circumstances—caused the nature of the

- 17 -

interrogation to evolve from noncustodial during the first interview to custodial at the beginning of the second interview.

## D. Whether the Suspect was Informed that He was Free to Leave

"The determination of whether a reasonable person would believe that his or her freedom is restrained is made by looking at the totality of the circumstances." Shell, 932 So. 2d at 633. Mr. Bell was advised prior to the first interview that he was free to leave. However, as noted above, Mr. Bell was not told that he was free to leave at the beginning of the second interview. Instead, after the detectives misled Mr. Bell by stating that they had just a few more questions, they assailed him verbally with repeated claims that his denials were lies and that they could prove it. Given the seriousness of the conduct at issue and the other circumstances, a reasonable person would not have believed that he was free to leave at that point. "Short of being handcuffed and being told that he was under arrest, we cannot perceive of circumstances that would be more indicative of a custodial interrogation than the circumstances of the interrogation in this case." Ramirez, 739 So. 2d at 574.

## E. The Detectives' Stated Reasons for Failing to Mirandize Mr. Bell

When Detective Schnable was asked why he had not given Mr. Bell the Miranda warnings, he responded: "Because it was a voluntary interview. We had no basis for an arrest." Similarly, when Detective McConchie was asked why Mr. Bell had not been arrested before the beginning of the second interview, he responded: "Based on the fact that we just had the children's statements. We needed further evidence to corroborate their statements." Relying on this testimony, the State points to the claimed insufficiency of the "evidence after the first interview and before the second to arrest

[Mr.] Bell" in support of the trial court's order. The detectives' testimony and the State's argument based on it are worth examining because they reflect a fundamental misunderstanding of the basis of the requirement for the Miranda warnings and the circumstances under which they are required to be given.

We may assume without deciding that the statements made by Mr. Bell during the second interview were "voluntary" in the sense that they were not the product of physical or mental abuse, prolonged questioning, or other forms of compulsion prohibited by the Fifth Amendment to the United States Constitution and article I, section 9, of the Florida Constitution. Nevertheless, voluntariness in this sense does not mean that the delivery of the Miranda warnings to Mr. Bell was not required. The United States Supreme Court has explained:

> The Miranda exclusionary rule . . . serves the Fifth Amendment and sweeps more broadly than the Fifth Amendment itself. It may be triggered even in the absence of a Fifth Amendment violation. The Fifth Amendment prohibits use by the prosecution in its case in chief only of *compelled* testimony. Failure to administer Miranda warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under Miranda. Thus, in the individual case, Miranda's preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm.

Oregon v. Elstad, 470 U.S. 298, 306-07 (1985) (footnote omitted); see also Cuervo v. State, 967 So. 2d 155, 161 (Fla. 2007) ("[T]he prophylactic rule of Miranda 'sweeps more broadly than the Fifth Amendment itself,' and encompasses statements that may not have been 'involuntary in traditional terms.' " (quoting Elstad, 470 U.S. at 306; and Miranda, 384 U.S. at 457)). Thus the assumed voluntary nature of Mr. Bell's statements

for purposes of the Fifth Amendment does not mean that the Miranda warnings were not required to be given.

The excuse offered for failure to Mirandize Mr. Bell by Detective Schnable and Detective McConchie that they lacked enough evidence to arrest Mr. Bell is unavailing for multiple reasons. First, this claim is false in fact. This court has defined the standard for probable cause for an arrest as follows:

> An officer has probable cause to arrest a suspect when there are reasonable grounds to believe the suspect has committed a felony. The facts from which probable cause arises do not need to meet the standard for conclusiveness and probability required of facts on which a conviction is based. However, probable cause does not arise when conduct is equally consistent with activity that is not criminal.

Nickell v. State, 722 So. 2d 924, 925 (Fla. 2d DCA 1998) (citations omitted). When the detectives began the second interview with Mr. Bell, they already had a detailed statement about Mr. Bell's involvement in sexual activity with the children from Mr. Crump, an adult, in addition to individual statements from the children that confirmed Mr. Crump's account. Undoubtedly, these three statements gave the detectives probable cause for an arrest.

Second, assuming that the detectives actually lacked probable cause for an arrest, that fact would not adequately explain a failure to Mirandize Mr. Bell under the circumstances shown here. Mr. Bell had been at the operations center for several hours. Although the detectives' unarticulated plans are not pertinent to the issue of whether Mr. Bell was in custody, the detectives' intention at the beginning of the second interview was obviously to obtain incriminating admissions from Mr. Bell and then place him under arrest. Generally speaking, it is a good practice for police officers to

Mirandize suspects and arrestees before interviewing them whether or not the Miranda warnings are actually required. After all, one of the purposes of the Miranda rule is "to help police officers conduct interrogations without facing a continued risk that valuable evidence would be lost." Michigan v. Tucker, 417 U.S. 433, 443 (1974). The detectives' excuses about an asserted lack of probable cause for an arrest do not explain their decision to depart from that good practice here.

Third, contrary to the implication in the detectives' excuses and the State's argument based on them, the requirement to provide the Miranda warnings does not depend on whether the police either have or lack probable cause for an arrest. The test for whether or not the Miranda warnings are required is an objective one and does not depend on the officer's subjective views about the degree of an interviewee's culpability or the officer's plans concerning an arrest. As the United States Supreme Court has explained:

> An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned. Those beliefs are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her "freedom of action." Berkemer[ v. McCarty], 468 U.S. [420,] 440 [(1984)]. . . . In sum, an officer's views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be one among many factors that bear upon the assessment whether that individual was in custody, but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or freedom to leave.

Stansbury v. California, 511 U.S. 318, 325 (1994) (citations omitted); see also Mansfield v. State, 758 So. 2d 636, 643 (Fla. 2000); England v. State, 46 So. 3d 127, 130 (Fla. 2d

DCA 2010); Snead v. State, 913 So. 2d 724, 726 (Fla. 5th DCA 2005). Detective Schnable and Detective McConchie did not communicate to Mr. Bell their claimed view that they lacked probable cause for his arrest at any time. Thus the detectives' unexpressed views about whether or not they had probable cause to arrest him have no bearing on the issue of whether their second interview with Mr. Bell was custodial in nature for purposes of Miranda.

After considering the totality of the circumstances surrounding the second interview with Mr. Bell, we conclude that the interview was custodial in nature. Because the detectives failed to give Mr. Bell the required Miranda warnings before beginning the second interview, the trial court erred in denying the motion to suppress the statements made by Mr. Bell during the second interview.

## VI. THE ISSUE OF HARMLESS ERROR

The State also argues that even if the trial court erred in denying Mr. Bell's motion to suppress his second statement, the error was harmless beyond a reasonable doubt based upon the other evidence of his guilt that the State presented at trial. "The erroneous admission of statements obtained in violation of Miranda is subject to harmless error analysis." Mansfield, 758 So. 2d at 644 (quoting Caso v. State, 524 So. 2d 422, 425 (Fla. 1988)). The test for harmless error

> places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction. Application of the test requires an examination of the entire record by the appellate court including a close examination of the permissible evidence on which the jury could have legitimately relied, and in addition an even closer

> examination of the impermissible evidence which might have possibly influenced the jury verdict.

State v. DiGuilio, 491 So. 2d 1129, 1135 (Fla. 1986). DiGuilio also teaches "that harmless error analysis must not become a device whereby the appellate court substitutes itself for the jury, examines the permissible evidence, excludes the impermissible evidence, and determines that the evidence of guilt is sufficient or even overwhelming based on the permissible evidence." Id. at 1136. With these principles in mind, we may review briefly the evidence presented at trial.

The State presented proof of the offenses charged against Mr. Bell through the testimony of Mr. Crump and the two minor children. The State also presented the testimony of Detective Schnable and Detective McConchie concerning the two interviews with Mr. Bell. Finally, the State played the audio recordings of Mr. Bell's two statements for the jury.

Mr. Bell testified in his own defense; he also called three witnesses to testify. One of these three witnesses was a family friend who had known Mr. Bell for many years. She testified that the children had told her that although Mr. Crump had perpetrated various offenses against them, Mr. Bell had never done so. This friend of the family also testified that the children had been offered a variety of inducements if they went to live with relatives—a possibility that would come to fruition if Mr. Bell was convicted and sent to prison.

Two men who had lived at Mr. Bell's residence during at least part of the time during which the offenses were alleged to have occurred also testified on his behalf. These two men denied seeing any improper conduct with the children. The

witnesses also raised questions about the timeline of the events offered in the testimony of Mr. Crump and the children.

Mr. Bell testified that neither he nor Mr. Crump had engaged in any improper conduct with the children. Mr. Bell claimed that he made admissions to improper conduct during the second interview because the detectives told him that "if I admitted to something, that they would help me out, and it would all be over. And I didn't know what to do." Asked to explain the level of detail in his statement, Mr. Bell said that he had merely responded to prompts supplied by the detectives about what he should say and went along with their suggestions about what had happened. In Mr. Bell's words, "I was saying what they were saying. I was just agreeing to it."

During the prosecutor's initial closing argument, she made five separate references to Mr. Bell's second statement as proof of his guilt. In her rebuttal closing argument, the prosecutor made four more separate references to the second statement. In addition, the prosecutor interrupted her rebuttal closing argument to replay a substantial portion of Mr. Bell's second statement to the detectives. The presentation of a portion of Mr. Bell's second statement during the State's rebuttal argument fills seven pages of the transcript of our record.

Absent the second statement, the State had a strong case against Mr. Bell, but the case was not airtight. The State's adult eyewitness, Mr. Crump, had been charged with multiple serious offenses for which he had yet not gone to trial or been sentenced. Therefore, one could not disregard the possibility that Mr. Crump's testimony was calculated to curry favor with the prosecution. In addition, Mr. Crump admitted that he had discussed the possibility of recanting his claims against Mr. Bell

- 24 -

with his lawyer but that he had ultimately decided not to do so. Therefore, serious questions could be raised about Mr. Crump's credibility.

The children had initially told investigators that Mr. Bell had not engaged in any improper conduct with them. There were a variety of discrepancies and inconsistencies in their testimony. At the very least, the testimony of Mr. Bell's three witnesses raised some doubts about the accuracy of the accounts of the events offered by Mr. Crump and the children.

Absent the recording of the second interview, the State's case against Mr. Bell rested on the credibility of Mr. Crump and the children. The record does not reveal whether the State obtained any usable evidence from the cell phones and computers taken from Mr. Bell's residence. But the State did not present any such evidence at trial. In addition, the State did not have any DNA or other physical evidence to bolster the testimony of Mr. Crump and the children. Mr. Bell's second statement to the detectives was substantially incriminating. After an examination of the entirety of the record, we conclude that the State has not met its burden of demonstrating that there is no reasonable possibility that the erroneous admission of Mr. Bell's second statement contributed to the verdict. See Ross v. State, 45 So. 3d 403, 434-35 (Fla. 2010); Bussey v. State, 184 So. 3d 1138, 1147-48 (Fla. 2d DCA 2015).

## VII. CONCLUSION

After a careful consideration of all of the facts and circumstances in this case, we conclude that the detectives' second interview with Mr. Bell was custodial in nature from the beginning. The trial court erred in ruling to the contrary. The introduction into evidence of Mr. Bell's statements during the second interview was not

harmless.  The failure of the detectives conducting the interview to give Mr. Bell the required <u>Miranda</u> warnings at the outset of the second interview compels us to reverse Mr. Bell's judgment and sentences and to remand this case to the trial court for a new trial, during which evidence of his second statement to the detectives must be suppressed.

Reversed and remanded.


CASANUEVA and KELLY, JJ., Concur.