NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

JOSEPH CUSHMAN,                        )
                                       )
                Appellant,             )
                                       )
v.                                     )       Case No. 2D16-1267
                                       )
STATE OF FLORIDA,                      )
                                       )
                Appellee.              )
_____)

Opinion filed September 27, 2017.

Appeal from the Circuit Court for Polk
County; Wayne M. Durden and Jalal A.
Harb, Judges.

Howard L. Dimmig, II, Public Defender,
and J.L. "Ray" LeGrande, Special Assistant
Public Defender, Bartow, for Appellant.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Kiersten E. Jensen,
Assistant Attorney General, Tampa,
for Appellee.


MORRIS, Judge.

Joseph Cushman appeals his convictions after a jury trial for two counts of sexual battery on a child under twelve and two counts of battery.[1] He challenges the trial court's denial of a motion to suppress statements he made during an interview with law enforcement, arguing that the interview was custodial and that he was not read his Miranda[2] rights. We conclude that the initial portion of the interview was not custodial but that the interview turned custodial and that the trial court therefore erred in failing to suppress the statements Cushman made after that point because the detective failed to advise him of his Miranda rights. Accordingly, we reverse his convictions.

## I. Background

### A. Motion to suppress

Prior to trial, Cushman filed a motion to suppress a recorded statement taken by the Polk County Sheriff's Office during an interview at a sheriff's substation. He argued that his statement was not voluntarily made and that it was taken in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and article I, section 16, of the Florida Constitution.

At the suppression hearing, the State presented the testimony of law enforcement officers who responded to the home of the two child victims, J.S. and J.V. The responding deputy testified that the victims' mother had learned of the victims' allegations against Cushman. The deputy made contact with an investigator with the Department of Children and Families (DCF) and a detective. While he waited for the detective to arrive, the deputy told Cushman that he could stand next to the deputy's patrol vehicle, but the deputy never told Cushman that he had to stand next to or sit in

---

[1]He was sentenced to concurrent life sentences on the sexual batteries and to 365 days in jail on the batteries.

[2]Miranda v. Arizona, 384 U.S. 436, 476 (1996).

the vehicle. At one point, the deputy offered that Cushman could sit in the car and Cushman sat in the car with the door open. Cushman was permitted to move about freely and exited the car to smoke a cigarette. The deputy did not tell Cushman that he was under arrest or that he was not free to leave, and the deputy did not handcuff Cushman. The deputy did not speak to Cushman about the investigation or make him any promises. After the detective arrived and spoke with Cushman, the deputy gave Cushman a ride to the substation. Cushman rode in the back because the deputy's training officer rode in the front passenger seat. During the ride and at the substation, the deputy never spoke to Cushman about the investigation or made him any promises and never told Cushman that he was under arrest or that he was not free to leave. During the ride, he and Cushman had a normal conversation about Cushman wanting to become a police officer at one point in his life and about hunting or farming. Once they arrived at the substation, the deputy did not handcuff Cushman and the deputy told Cushman that he could follow him into the substation. The detective then escorted Cushman to an interview room; a card was necessary to enter through a secured door, but a card was not necessary to exit. Cushman could have exited on his own. It was approximately a couple of hours from the time the deputy made contact with Cushman to the time that he drove him to the substation. The deputy never raised his voice or displayed his weapon to Cushman.

The detective testified that he responded to the victims' house and was briefed by the deputy. The detective made contact with Cushman, who was sitting in the deputy's patrol car, to see if he was "okay to hang out" and to address any concerns that Cushman may have had. The detective did not tell Cushman that he was under

arrest, that he was not free to leave, or that he had to stay in the vehicle. Cushman was not handcuffed.

After the detective spoke with the victims and their mother, he made "sure [Cushman] didn't have anything [they] needed to take care of" and the detective requested Cushman to go with him to the substation for an interview. The detective "told him [that] he did not have to come," that "it was of his own free will," that "even though he's in the back of the patrol car[,] he's still free to go," and that "[h]e can go at any time." The detective would have told him that he was not under arrest and that he was not being detained. The detective told Cushman that the officers could take Cushman home if he did not want to go to the substation. Cushman agreed to go to the substation.

When they arrived at the substation, the detective walked with Cushman to the interview room. Cushman was not handcuffed at the substation. The detective did not tell Cushman he was not free to leave or that he was under arrest. The detective did not tell Cushman that he did not need to speak with the detective, but the detective did tell Cushman at least three times that he was free to leave if he did not want to speak with the detective. The detective did not make any promises to Cushman and did not tell him that he would not be arrested. The detective believed that Cushman answered the questions appropriately and did not have difficulty understanding. The detective recorded his interview with Cushman, which lasted about forty-five minutes. The detective never displayed his weapon or raised his voice to Cushman.

The detective believed that the interview was noncustodial and that Cushman was not in custody until he was arrested after the interview concluded. The detective stated that after speaking to the victims, their mother, and the investigator,

- 4 -

Cushman was a suspect. The purpose of the interview was "to get the truth" and "[i]f that's a confession, that's a confession." The detective admitted that if Cushman had admitted to something that amounted to a lewd act, Cushman would have been arrested. But the detective did not arrest Cushman until the interview was over. Cushman was not read his Miranda rights until the end of the interview because the detective considered the interview to be noncustodial. Cushman never told the detective that he wanted to go home.

The trial court considered the audio recording of the interview. A transcript of the recording is in our record. At the beginning of the interview, the detective confirmed that Cushman was there of his own free will, that he understood he was not being arrested or detained, and that he understood he did not have to talk to the detective or answer any questions. The detective told Cushman that he just wanted to get to the truth and they could "just go on from there" and "put the whole thing behind us." The detective told Cushman that the detective had heard Cushman wanted to be a "cop," and Cushman said he wanted to help citizens. They talked about Cushman hunting. The detective asked Cushman if he knew what was going on, to which Cushman answered affirmatively, and the detective told Cushman that anybody who is pro-law enforcement "is part of the family" and that the detective needed to get to the truth. The detective said that "[t]here ain't no reason why this has got to haunt us for the rest of our lives or anything like that."

Cushman stated that another officer had told him that Cushman "pulled [the victims'] pants down," but Cushman denied doing so. The detective told Cushman that the detective would keep to himself what the victims had told the detective but that the detective just wanted the truth from Cushman. The detective said that Cushman

had a future ahead of him and that he would do everything he could to help Cushman in the future, but what the victims had told the detective was worse than what Cushman was admitting. The detective suggested that there would be physical evidence of a sexual activity and that after further interviews of the children, the truth would come out. He again mentioned the "law enforcement family," that all people make mistakes, and that the family needs to be "honest with each other." The detective reiterated that a mistake would not end Cushman's life. Cushman said that the victims had been taking a bath and "messing with each other," but Cushman denied doing anything.

The detective again mentioned that people make mistakes and that he did not believe that Cushman was a monster. Cushman asked: "This stays with y'all, right? It doesn't get out to nobody else?" The detective could not guarantee that but said he would not go back and tell anybody in the family. Cushman said he never touched J.V., but when the detective asked about J.S., Cushman said he made a mistake. Cushman admitted touching J.S.'s bottom with his hand.

The detective then asked if Cushman had touched J.S.'s bottom with his penis or tried to put his penis in J.S.'s bottom, and Cushman denied it. When the detective persisted in his questioning, Cushman remained quiet. Cushman finally said that the questioning was making him uncomfortable and made him feel like a monster. The detective then urged Cushman to talk about it because he would feel better, and Cushman said, "I'm probably going to go [to] jail now." The detective asked Cushman whether going to jail was a big deal or whether it was more important to be a good person. The following exchange then occurred:

> CUSHMAN: Are you going to take me to jail tonight?
> DETECTIVE: Huh?
> CUSHMAN: Are you going to take me to jail tonight?
> DETECTIVE: I'm not.

CUSHMAN:  They are?
DETECTIVE:  I don't know.  We've got to get to the truth first, though.  Because this is the thing, Joey, the—what I am being told is worse than what you're telling me.  It's worse than everything that I'm asking you.

. . . .

CUSHMAN:  They told me they weren't taking me to jail tonight.
DETECTIVE:  Okay.  Let's go back to what happened.  Let's talk about what happened.

The detective then continued to ask Cushman about what he had done to the victims.  Cushman admitted to committing sexual batteries against the victims.[3] During his confession, Cushman stated that "if they do take me to jail, I'm going to be in there for a while."  At the end of the interview, the detective told Cushman that he was "going to have to go to jail tonight because of this."  Cushman then told the detective that he had lied and that he had never touched the two victims.

At the suppression hearing, the defense presented the testimony of Cushman's mother.  She testified that Cushman suffered from seizures as a child and was diagnosed with ADHD, bipolar disorder, and a learning disability.  He received counseling throughout his life, and he attempted to commit suicide at age fifteen.  He was in special education classes from second grade until tenth grade and was made fun of throughout his life.  She said that even though Cushman referred to an uncle in Tennessee with cancer during his interview with police, he has no uncle in Tennessee.

---

[3]Due to the legal issues involved in this case, it is necessary to recount the conversation between the detective and Cushman in which details of the sexual offenses were revealed.  The detective asked Cushman if he put his penis in J.S.'s bottom, and Cushman finally admitted that his penis came into contact with the child's bottom.  After more questioning, Cushman admitted that he tried to put it into J.S.'s bottom but that it would not fit and that he also touched J.V.'s bottom with his hand.  Cushman gave more details about how he touched J.S.'s bottom.  He also stated that the "exact same thing" "happened a day later again" and that he also rubbed J.V.'s anus with his finger.  He then admitted that he did the same thing to J.V. that he did to J.S.

He has a hard time carrying on a conversation, and he believes whatever is happening on television is happening in his own life. On the day of his arrest, Cushman called her and he was frantic. She drove to the victims' house to try to see Cushman, but the officers would not let her see him. She stated that the officer threatened to "tase" her if she walked closer to Cushman and told her that she needed to leave. She observed Cushman standing by the patrol car but was not allowed to speak to him. After his arrest, he was found to be incompetent and received competency training for about a year.

Cushman testified that he always had a hard time in school and that he was constantly teased. Prior to this, he had never been questioned by the police. On the day of his interview, a deputy told him to stand by the car and wait on the other officers. He stood there for about twenty minutes until the other officers arrived. They told him to be calm and wait. He kept asking what was going on and they would not tell him. He smoked a cigarette with the first deputy. The detective told Cushman that they were going to take him for an interview but they would take him home if wanted to go home. Cushman stated that during the ride, he asked the officers twice to take him home but they ignored him. Cushman did not want to go to the substation. When the detective came into the interview room, Cushman told him that he wanted to go home but the detective told him that he could not leave at that point. Cushman also stated that he asked the detective two more times if he could leave, and the detective told him the same thing. Cushman felt that he could not leave at that point and that if he had walked out, they would have handcuffed him.

After the presentation of the evidence, the State argued that under the factors in Ramirez v. State, 739 So. 2d 568 (Fla. 1999), the interview was not custodial.

The State also argued that the statements made by Cushman were voluntary. Cushman contended that the interview was custodial and that the tactics used by the detective weighed in favor of a finding of custody and also a finding that the statements were involuntary. The trial court entered an order denying Cushman's motion to suppress, concluding that Cushman was not in custody during the interview and that his statements were voluntarily made. The trial court credited the testimony of the officers over Cushman's testimony.

B. Trial proceedings

At trial, the State presented the testimony of the two child victims.[4] Their mother also testified that Cushman was living with her and her children in 2011 when DCF investigators came to speak to her older children on an unrelated matter and learned of the allegations against Cushman. The DCF investigator testified that she interviewed the first victim, J.S., at his house. She testified to J.S.'s description of the acts committed by Cushman. The investigator was present when the detective attempted to interview J.V. later, but J.V. did not make any disclosures to the detective. The child protection team (CPT) case coordinator testified that she interviewed J.S. and that J.S. disclosed that he had been sexually abused by Cushman. The video of her interview with J.S. was published for the jury. J.S. also described to the case coordinator the act that Cushman committed against J.V. J.S. said that it happened on two different days.

The detective testified that he interviewed J.S. and that J.S. described the act that Cushman committed against J.S. "two times." A recording of the detective's

---

[4]The first victim, J.S., was ten years old at the time of trial. The second victim, J.V., was nine years old at the time of trial. They both testified that Cushman put his "front private part" in their "back private part[s]."

- 9 -

interview with J.S. was played for the jury. The detective also interviewed J.V., but J.V. did not make any disclosures to the detective. The detective witnessed the CPT interview of J.V. during which J.V. did not make any disclosures. The children were not taken for medical examinations. The detective's interview of Cushman was played for the jury.

Cushman testified in his defense. He denied touching the victims in any kind of sexual manner. He said that he did not get along with the children because they were "constantly being bad" and he was having to discipline them. As he walked by a window, he heard them tell the investigator at their house that he had touched them. He was shocked and upset and ran inside to tell their mother that he did not do it.

The trial court granted a judgment of acquittal on one of the molestation counts, as to J.V. The jury found Cushman guilty of a sexual battery and a battery as to each victim, with the batteries being lesser included offenses of two sexual battery charges. The jury found Cushman not guilty of the single molestation count as to J.S.

## II. Analysis

Cushman argues that the trial court erred in denying his motion to suppress because he was subjected to a custodial interrogation without the benefit of Miranda warnings. In its order denying Cushman's motion to suppress, the trial court addressed the factors set forth in Ramirez, 739 So. 2d at 574, and concluded that "Cushman was not in custody during his interview" and that "Miranda was not required."

Miranda warnings are required when a suspect is the subject of a custodial interrogation. State v. Pitts, 936 So. 2d 1111, 1123 (Fla. 2d DCA 2006) (quoting Miranda v. Arizona, 384 U.S. 436, 476 (1996)). "Custody for purposes of Miranda encompasses not only formal arrest, but any restraint on freedom of movement

- 10 -

of the degree associated with formal arrest." Ramirez, 739 So. 2d at 573. In Ramirez, the supreme court adopted a four-factor test that

> provides guidance in making the determination whether a reasonable person in the suspect's position would consider himself in custody: (1) the manner in which police summon the suspect for questioning; (2) the purpose, place, and manner of the interrogation; (3) the extent to which the suspect is confronted with evidence of his or her guilt; (4) whether the suspect is informed that he or she is free to leave the place of questioning.

Id. at 574.

This "test must be understood as simply pointing to components in the totality of circumstances surrounding an interrogation." Pitts, 936 So. 2d at 1124. "No factor . . . can be considered in isolation. The whole context must be considered." Id. "The focus of the inquiry must remain on whether a reasonable person in the suspect's position—given all the relevant circumstances—would have understood himself to be in custody." Id.; see also Ramirez, 739 So. 2d at 573 ("The proper inquiry is not the unarticulated plan of the police, but rather how a reasonable person in the suspect's position would have perceived the situation." (quoting Davis v. State, 698 So. 2d 1182, 1188 (Fla. 1997))). "Failure to administer Miranda warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under Miranda." Bell v. State, 201 So. 3d 1267, 1278 (Fla. 2d DCA 2016) (quoting Oregon v. Elstad, 470 U.S. 298, 306-07 (1985)).

We first consider the manner in which the police summoned Cushman for questioning. Cushman was summoned for an interview during the middle of the day. While investigators were speaking with the mother and the child victims at the house, a deputy stood outside with Cushman. The deputy told Cushman that Cushman could

stand near or sit in the patrol car. The deputy never told Cushman that he had to sit in the car; Cushman chose to sit in the car. Cushman moved about freely, exiting the car to smoke.

When the detective arrived at the house, he asked Cushman if Cushman was "okay to hang out." After the detective spoke with the mother and child victims, the detective asked Cushman to come to the substation for an interview. The detective told Cushman that "he did not have to come" and that "it was of his own free will." The detective told Cushman that "even though he's in the back of a patrol car[,] he's still free to go" and "can go at any time." The detective stated that he would have told Cushman again that he was not under arrest, that he was not being detained, and that if he did not want to come, he could be taken home. Cushman agreed to go to the substation.

Cushman rode in the back seat of the deputy's car because the deputy's training officer rode in the front passenger seat. Cushman was not handcuffed. The deputy and Cushman had a conservation in normal tone. When they arrived at the substation, the deputy walked Cushman into the substation and the detective then walked Cushman to an interview room. He was not handcuffed or told he could not leave. The transcript of the interview shows that the detective confirmed with Cushman that Cushman was at the station of his own free will and that Cushman understood he was not under arrest and that he did not have to speak to the officers.

The law supports the trial court's conclusion that this factor weighs against a finding of custody. See Hunter v. State, 8 So. 3d 1052, 1062 (Fla. 2008) (concluding that defendant was not in custody where he was ordered out of the house along with other people, "was told to put his hands on his head, and then was directed to sit on the sidewalk"; defendant was "asked if he would go with the police to answer some

questions"; defendant sat in back of patrol car with a detective; and when defendant arrived at the station, he was told he was free to leave, that he was not under arrest, and that he could have a ride home); Pitts, 936 So. 2d at 1117, 1125 (holding that despite the early hour of the police visit (4 a.m.), this factor weighed against a finding of custody where the police arrived at defendant's apartment, asked his sister to wake him up, and asked if he would mind coming to the substation; defendant was allowed to get dressed before leaving; and defendant was not subject to any physical restraint and rode in the front seat of the police vehicle); Cillo v. State, 849 So. 2d 353, 355 (Fla. 2d DCA 2003) (holding that the first Ramirez factor did not indicate that defendant was in custody where defendant "was never told that he had to go to the sheriff's office," "he never indicated that he did not want to go," and he agreed during the interview that he voluntarily went with police to the station).

Cushman may have felt he was being watched or supervised by the deputy at the house, but when the detective arrived, the detective asked if Cushman was okay to hangout. Cf. Killian v. State, 761 So. 2d 1210, 1212-14 (Fla. 2d DCA 2000) (holding that the defendant was in custody where he was standing outside of his house for a majority of the time under the watchful eye of a police officer while a search warrant was being executed inside the house by four officers, the defendant asked permission to get a drink inside the home, the defendant was never informed he was free to leave, and the defendant was confronted with the allegations of the child victim). This should have indicated to a reasonable person that his freedom was not being restrained. And any feeling of restraint Cushman may have felt at the house would have been dispelled when the detective asked him to come to the substation, told him

he did not have to do so, told him that he was not under arrest, and told him that he could go home.

Next, we turn to the extent to which the suspect is confronted with evidence of guilt. "A reasonable person understands that the police ordinarily will not set free a suspect when there is evidence 'strongly suggesting' that the person is guilty of a serious crime." Pitts, 936 So. 2d at 1128. "That does not mean that whenever a suspect is confronted with some incriminating evidence, the suspect is in custody for purposes of Miranda." Id.

The trial court found that during the interview, the detective refused to divulge to Cushman what the victims had told the detective. The trial court also found that the detective "did state that there could be more evidence in the form of physical evidence after an examination of the [victims]" but that Cushman was not "told that any physical evidence had been found." These findings are supported by the record. However, a review of the interview shows that at the beginning of the interview, Cushman indicated that he was aware of the nature of the allegations against him: "Well, what the officer told me is that I pulled [the victims'] pants down and that he—you know, and I didn't." Even though Cushman knew of this accusation against him, this does not in itself mean that he believed himself to be in custody, especially when he had just been repeatedly told by the detective moments before that he was not under arrest. See Pitts, 936 So. 2d at 1128 ("The significance of this factor turns on the strength of the evidence as understood by a reasonable person in the suspect's position as well as the nature of the offense. If a reasonable person in the suspect's position would understand that the police have probable cause to arrest the suspect for a serious crime such as murder or kidnapping, that circumstance militates strongly toward

the conclusion that the suspect is in custody." (footnote omitted)); Cillo, 849 So. 2d at 356 (holding that the fact that defendant had been informed "of the victim's allegations" of a lewd and lascivious act did not alone support a conclusion that he was in custody).

Next, we consider whether Cushman was informed he was free to leave. "[A] suspect need not be advised that he or she is free to leave in order for the court to determine that the suspect was not in custody."  State v. Shell, 932 So. 2d 628, 633 (Fla. 2d DCA 2006) (citing Noe v. State, 586 So. 2d 371, 373, 381 (Fla. 1st DCA 1991)). But "it is certainly true that a suspect who has been advised that he is free to leave is less likely to be deemed to be in custody than a suspect who has not been so advised." Pitts, 936 So. 2d at 1125.

The trial court found that Cushman "was told several times that he was free to go."  The detective testified that he told Cushman that he was free to go and that he did not have to go to the substation; the detective said that he told Cushman at least three times that he was free to leave if he did not want to talk.  At the beginning of the recorded interview, the detective told Cushman that he was not under arrest and that he did not have to talk with the detective if he did not want to.  Therefore, this factor weighs against a finding of custody.  See Hunter, 8 So. 3d at 1062 (concluding that defendant was not in custody where he was asked to go to the station to answer some questions, he was told he did not have to go with police, and he was told at the station that he was free to leave and that he was not under arrest); Cillo, 849 So. 2d at 356 (holding that where defendant was told "that he was not under arrest and that he could leave at any time[,] . . . the final factor in Ramirez was not indicative of a custodial interrogation").

Last, we consider the purpose, place, and manner of the interrogation. While "[m]ost custodial interrogations take place in a police station, and a defendant's

presence in a station while subjected to questioning undoubtedly can have a bearing on how a reasonable person in the defendant's situation views his status," Pitts, 936 So. 2d at 1126, "mere questioning at the police station does not establish custody," State v. Thompson, 193 So. 3d 916, 921 (Fla. 2d DCA 2016), review denied, No. SC16-1029, 2016 WL 6602417 (Fla. Nov. 8, 2016).

The trial court noted that the interview took place in a police station interview room, but the trial court did not make a finding regarding the purpose of the interview. While the purpose of the interview may have been to obtain a confession from Cushman, it was also likely that the purpose was to find out if there was any substance to the victims' allegations against him and whether a crime occurred. "[L]aw enforcement suspicion, by itself, does not turn a consensual encounter into a custodial interrogation." Thompson, 193 So. 3d at 921; see Monroe v. State, 148 So. 3d 850, 856 (Fla. 1st DCA 2014) (explaining that where defendant did not have knowledge that agent possessed a warrant for his arrest prior to interview, "the fact that the agent already had a warrant for [defendant]'s arrest and hoped to obtain a confession does not conclusively establish that [defendant] was in custody for Miranda purposes" (citing Berkemer v. McCarty, 468 U.S. 420, 442 (1984))), remanded on other grounds, 191 So. 3d 395 (Fla. 2016).

The manner of interrogation also weighs against a finding of custody. The record supports the trial court's findings that Cushman "was never made any promises or threats" and that Cushman "easily followed the conversation" and "answered appropriately." The detective started the interview by confirming with Cushman that Cushman was there of his own free will. The detective was not forceful or intimidating and conducted the interview in a conversational tone. See Cillo, 849 So. 2d at 355-56

(holding that manner of interrogation was not coercive where "interview was conversational," "no threats or promises were made," defendant was composed and reasonably responsive in his verbal answers, and defendant was not "intimidated or subdued by the presence of the detectives or the questions being asked"); Monroe, 148 So. 3d at 856 (noting that the agent "conducted the interrogation in a conversational tone free of threats or promises" and "[a]lthough [the agent] was persistent, opinionated, and orally confrontational, he did not use coercive measures to elicit information from [defendant] during the relatively brief interview"). Further, even if the atmosphere was coercive, "a noncustodial situation is not converted to a custodial one simply because, in the absence of any formal arrest or restraint on freedom of movement, the interview took place in a coercive atmosphere." Cillo, 849 So. 2d at 356 (citing California v. Beheler, 463 U.S. 1121, 1124 (1983)).

While the totality of the circumstances leads to the conclusion that the initial portion of the interview of Cushman was not custodial, we cannot reach the same conclusion regarding the entire interview. Fifteen pages into the transcript of the interview, Cushman admitted that he touched J.S. on the child's "butt" with his (Cushman's) hand. He admitted that he "rubbed [J.S.'s] butt" in the bathroom. The detective urged Cushman to tell him the truth and suggested that there might be some type of evidence left behind. The interview continued and resulted in Cushman making further admissions that sexual batteries had occurred.

"What begins as a noncustodial interrogation accordingly may be transformed into a custodial interrogation by a confession that the suspect utters during the interrogation." Pitts, 936 So. 2d at 1134; see also Roman v. State, 475 So. 2d 1228, 1231-32 (Fla. 1985) ("Indeed, occasions would be rare when a suspect would confess

- 17 -

to committing a murder and then be allowed to leave. Certainly the noncustodial atmosphere leading up to a confession and probable cause would thereby be expected to be converted to a custodial one."). "A suspect's confession of wrongdoing may result in a situation which a reasonable person would conclude is custodial." Pitts, 936 So. 2d at 1134; see also Bell, 201 So. 3d at 1274 ("Because the circumstances of a suspect's encounter with the police are frequently fluid, the nature of such an encounter may change over time from noncustodial to custodial."). Based on the totality of the circumstances discussed above, Cushman was not in custody during the initial portion of the interview, but once Cushman admitted to committing a sex crime, i.e., rubbing one of the victims on the bottom, a reasonable person in his position would believe that he was no longer free to leave. See Pitts, 936 So. 2d at 1134 (holding that once defendant confessed to a serious crime by admitting to holding a gun on the two victims, "a reasonable person in [his] situation would have understood that he would not be allowed to go free" and that "[a]t that point, the interrogation became custodial and the protections afforded by Miranda became applicable"). This is supported by Cushman's own statements; after he made the initial admission to touching J.S. on the bottom, Cushman indicated that he believed he would now be going to jail. Cushman asked the detective twice if he would be going to jail, and the detective avoided answering him. During his testimony at the suppression hearing, the detective confirmed that while he did not think he would have arrested Cushman that night if Cushman had not talked to him, the detective would have arrested Cushman once Cushman had made a confession. He stated that he would have arrested Cushman even if Cushman had only confessed to a lewd act.

- 18 -

Once the interrogation became custodial, Cushman was entitled to be advised of his <u>Miranda</u> rights. The statements made by Cushman after this point should have been suppressed. These subsequent statements were extremely incriminating because in them Cushman admitted to committing sexual batteries against the victims; therefore, it cannot be said that the trial court's error in failing to suppress these subsequent statements was harmless. See <u>Bell</u>, 201 So. 3d at 1281 (holding that trial court erred in denying defendant's motion to suppress because defendant had not been given <u>Miranda</u> warnings in a custodial interrogation and because the error was not harmless).

Cushman also contends on appeal that the trial court erred in denying his motion to suppress because his statements were not voluntary. See <u>DeConingh v. State</u>, 433 So. 2d 501 (Fla. 1983); <u>Grasle v. State</u>, 779 So. 2d 334, 336 (Fla. 2d DCA 2000). We conclude that the statements not requiring suppression—that is, the statements made up until the point at which the interview turned custodial—were voluntary. See <u>Grasle</u>, 779 So. 2d at 336 ("The test for voluntariness asks whether, under the totality of circumstances, the confession was a product of coercive police conduct."). Even though the defense presented evidence that Cushman had mental health issues and that he struggled in school and socially in life, he was able to understand the detective's questions and carry on a detailed conversation with the detective. The detective did not make any promises to Cushman and urged Cushman to tell the truth. See <u>Garcia v. State</u>, 60 So. 3d 1097, 1099 (Fla. 4th DCA 2011) ("A confession is not involuntary if officers do nothing more than 'encourage or request that person to tell the truth.' " (quoting <u>Chambers v. State</u>, 965 So. 2d 376, 378 (Fla. 4th DCA 2007)); cf. <u>Grasle</u>, 779 So. 2d at 336-37 ("Most significant to our analysis here is

- 19 -

the precept that a confession cannot be freely and voluntarily given if it has been elicited by the direct or implied promise of leniency.").  The detective appealed to Cushman's interest in law enforcement, but he never said anything that would have misled Cushman into believing that if he told the truth and admitted to the touching, he would still be able to have a future in law enforcement or that he would be able to walk away free.  In addition, at the start of the interview, Cushman had been told that he did not have to answer questions and that he was free to leave, and it was soon thereafter that he made the admission that he touched J.S. inappropriately.

In conclusion, we reverse Cushman's convictions and remand for further proceedings consistent with this opinion.

Reversed and remanded.


SILBERMAN and BLACK, JJ., Concur.